**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

HARIS MUJEZINOVIC and       )
CHARLIE MILLER, individually and on   )
behalf of all others similarly situated,    )
                             )
       Plaintiffs,           )       Cause No. 1:24-cv-01827
                             )
       v.                  )
                             )
THE TRUSTEES OF INDIANA   )
UNIVERSITY,               )
                             )
       Defendant.          )

<u>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**</u>

Plaintiffs Haris Mujezinovic and Charlie Miller ("Plaintiffs," "Mujezinovic," or "Miller"),

individually and on behalf of all others similarly situated, by counsel, file this Class Action

Complaint and Demand for Jury Trial against Defendant the Trustees of Indiana University ("IU").

## I.      INTRODUCTION

1.     Plaintiff Haris Mujezinovic is a former professional basketball player, a small

business owner, a spouse and a father. Mujezinovic played high school basketball at Amundsen

High School in Chicago, Illinois, began his college basketball career at Joliet Junior College from

1993 to 1995, then transferred to Indiana University, where we played for the Hoosiers from 1995

to 1997. After his tenure with the Hoosiers, Mujezinovic played basketball professionally in

Croatia, Italy, Turkey, Greece, Slovenia, Switzerland, Russia, Bulgaria, Cyprus, Ukraine,

Lithuania, and Spain. Over the course of his basketball career, Mujezinovic's hard work on and

off the court earned him a wide range of accolades, including winning a Junior College

Championship and multiple appearances in the Euro Championship.

2.     Since retiring from professional basketball, Mujezinovic has built a family and a

construction business in Bloomington, Indiana. Mujezinovic's spouse also graduated from IU and the couple have three children, one of whom now attends IU.

3.  Plaintiff Charlie Miller is a former professional basketball player, a spouse, a father, and founder of ATTACK Basketball Academy. Miller played high school basketball at South Miami High School in Florida. In 1994, Miller was selected as a McDonald's All-American and Florida's Gatorade Player of the Year. After graduating from high school, Miller played basketball for the Hoosiers from 1994 to 1998. After his tenure with the Hoosiers, Miller played basketball professionally across Europe and the United States, including in Finland and Switzerland from 1998-2000, and in the Continental Basketball Association with the Gary Steelheads, located in Gary, Indiana.

4.  After retiring from professional basketball, Miller founded ATTACK Basketball Academy, where he and his spouse work with boys and girls who learn the fundamentals of basketball through a wholistic player development approach. Miller has four children.

5.  In recent years, several high-profile cases of student athletes being victimized by sports physicians, many of whom worked for public and private colleges and universities, have shocked the public and generated significant media attention. These disturbing stories include that of University of Michigan wrestler Tad DeLuca, who alleged Dr. Robert E. Anderson, a University of Michigan physician who worked with student athletes, repeatedly conducted unnecessary and violative prostate and genital exams on otherwise healthy collegiate students and athletes.[1] After a thorough investigation, the University of Michigan identified more than 1,000 potential victims.[2]

---

[1] *University of Michigan Faces Sex Abuse Case Against Deceased Doctor*, NATIONAL PUBLIC RADIO (September 26, 2021), https://www.npr.org/2021/09/26/1040756506/university-of-michigan-faces-sex-abuse-case-against-deceased-doctor.
[2] *U. of Michigan reaches $490M settlement over sexual abuse by a former sports doctor*, NATIONAL PUBLIC RADIO (January 19, 2022), https://www.npr.org/2022/01/19/1074071024/university-michigan-sexual-abuse-sports-doctor/

Mr. DeLuca cited yet another physician sexual abuse scandal as the catalyst for his raising his decades-old claims against his alma matter—the case of Larry Nassar, a former USA Gymnastics doctor convicted of sexually abusing young athletes under the guise of medical treatment.[3]

6.     Mujezinovic and Miller, along with their former IU men's basketball teammates, must unfortunately add their names to the list of athletes subjected to routine, systemic sexual assault and sex-based harassment under the guise of medical care. Mujezinovic, Miller, and their former teammates—young, healthy college athletes—were routinely and repeatedly subjected to medically unnecessary, invasive, and abusive digital rectal examinations by the Hoosiers' former team physician, Dr. Bradford Bomba, Sr. ("Dr. Bomba, Sr."). Dr. Bomba, Sr. served as the IU men's basketball team physician for nearly 30 years and the U.S. Olympic Men's Basketball Team Physician under former IU Head Men's Basketball Coach Bob Knight.

7.     Dr. Bomba, Sr. first contracted with IU to provide medical services to its sports teams in 1962 and provided those services through 1970. In 1979, Dr. Bomba, Sr. contracted with IU to serve as the physician for the IU men's basketball program, a position he held for several decades, concluding in the late 1990s.[4]

8.     Despite its knowledge of these routine, pervasive, repeated sexual assaults, IU systemically mishandled and turned a blind eye to Hoosier men's basketball players' complaints of Dr. Bomba, Sr.'s sexual misconduct, contrary to federal regulations.

9.     Despite its knowledge of these routine sexual assaults, IU's failure to take effective preventative measures allowed this sexually abusive behavior to persist, caused harm to students,

---

[3] Mitch Smith & Anemona Hartocollis, *Michigan State's $500 Million for Nassar Victims Dwarfs Other Settlements*, NEW YORK TIMES (May 16, 2018), https://www.nytimes.com/2018/05/16/us/larry-nassar-michigan-state-settlement.html.
[4] *Indiana University statement on independent review*, INDIANA UNIVERSITY (Sep 11, 2024), https://news.iu.edu/live/news/37882-indiana-university-statement-on-independent-review; Daniel Flick, *IU to investigate allegations of inappropriate behavior from Hall of Fame doctor*, Indiana Daily Student (Updated Sep 12, 2024 11:15 am).

and perpetuated a policy of deliberate indifference to and tacit acceptance of Dr. Bomba's sexual misconduct.

10.    IU failed to take effective preventive measures and allowed repeated harm to students, including Plaintiffs, endorsing and perpetuating a culture of deliberate indifference and tacit acceptance of Dr. Bomba, Sr.'s sexual misconduct.

11.    Title IX was designed to protect students—like the Plaintiffs—from being preyed on by known sexual assailants. Instead, Mujezinovic, Miller, and their former teammates were forced to choose between enduring the sexual abuse Dr. Bomba, Sr. inflicted or abandoning their chance to play for a highly prestigious basketball program and complete their education at IU.

## II.    PARTIES, VENUE, AND JURISDICTION

12.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

13.    Defendant IU is a public educational institution with its flagship campus in Bloomington, Indiana.

14.    At all times relevant to this Class Action Complaint, IU has received federal funding in many forms, including federal student financial aid, and as such is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"). At all times relevant to this Class Action Complaint, IU has been contractually obligated to enforce Title IX in its programs and all IU student activities.

15.    Plaintiff Haris Mujezinovic is a citizen and resident of the State of Indiana. Mujezinovic attended IU and participated in IU's basketball program from 1995-1997.  He graduated from IU in 1997.

16.    Plaintiff Charlie Miller is a citizen and resident of the State of Texas. Miller

attended IU and participated in IU's basketball program from 1994-1998.  He graduated from IU in 1998.

17.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under Title IX.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because IU resides in this District and because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

### III.    FACTUAL ALLEGATIONS

#### A.  History and Purpose of Title IX

19.    Plaintiffs restate and reallege the allegations of all other paragraphs of this Class Action Complaint as if fully set forth herein.

20.    In 1972, Congress enacted Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

21.    Congress enacted Title IX with two principal objectives in mind: to avoid the use of federal resources to support discriminatory practices in education programs, and to provide individual citizens effective protection against those practices.[5]

22.    Since its enactment, courts have interpreted Title IX to protect students from sexual assault or sex-based harassment in educational programs or activities operated by recipients of federal funding.[6] Since sexual assault and sex-based harassment are inherently gender-based forms

---

[5] U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, *Title IX Legal Manual* (last accessed October 4, 2024), https://www.justice.gov/crt/title-ix#:~:text=Congress%20enacted%20Title%20IX%20with,677%2C%20704%20(1979).
[6] *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998).

of discrimination, allegations that an educational institution that receives federal funding has subjected a student to sex-based harassment or sexual assault while the student was participating in any education program or activity fall within the ambit of Title IX's protection.

**B. Mujezinovic's Collegiate Career with the Hoosiers.**

23.     Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

24.     In 1993, Mujezinovic started his college basketball career at Joliet Junior College in Joliet, Illinois.

25.     Mujezinovic played basketball at Joliet Junior College for two years, from 1993 to 1995. Mujezinovic and his teammates secured a Junior College Championship title for the 1993-1994 season.

26.     In 1994, Mujezinovic was recruited by a number of college basketball teams, including IU. Mujezinovic considered his options and decided to commit to transferring to IU to play basketball for the Hoosiers. Mujezinovic was thrilled to join the Hoosiers' premier collegiate basketball program. Mujezinovic's participation in a successful, high profile Big 10 men's basketball program provided him an opportunity to play for an NCAA championship caliber team and would likely open the doors to post-collegiate professional basketball opportunities.

27.     In 1995, Mujezinovic transferred to and attended IU as a student athlete and began playing basketball for the Hoosiers. At the time, Mujezinovic was twenty years old.

**C. Miller's Career with the Hoosiers.**

28.     Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

29.     In 1994, Miller was recruited by a number of college basketball teams, including

IU. Miller considered his options and decided to commit to attending IU to play basketball for the Hoosiers. Miller was thrilled to join the Hoosiers' premier collegiate men's basketball program. Miller's participation in a successful, high profile Big 10 basketball program provided him an opportunity to play for an NCAA championship caliber team and would likely open the doors to post-collegiate professional basketball opportunities.

30.     In 1994, Miller began attending IU as a student athlete and playing basketball for the Hoosiers. At the time, Miller was seventeen years old.

### D.  IU Men's Basketball Team Doctor, Dr. Bomba, Sr., Subjects Mujezinovic, Miller, and Their Teammates to Repeated and Routine Sexual Assaults.

31.     Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

32.     As a condition of continued participation in IU's basketball program, at all times relevant to the allegations herein, IU men's basketball players were required to submit to annual physicals with doctors chosen and provided by IU.

33.     At all times relevant to the allegations herein, IU controlled the agents it hired to perform the required physicals and controlled the context in which the physicals occurred.

34.     Upon information and belief, at all times relevant to the allegations herein, IU men's basketball players were required to authorize the agents IU hired to perform the required physicals to share the student athletes' private health information with IU, including information regarding procedures, tests, and care provided in the course of the required physicals, as a condition of continued participation in IU's basketball program.

35.     Upon enrollment at IU and joining the basketball team, Mujezinovic and Miller were required to submit to a physical examination with IU team doctor Dr. Bradford Bomba, Sr.

IU Head Men's Basketball Trainer Tim Garl[7] assigned players to Dr. Bomba, Sr. or his son, Dr. Bradford Bomba, Jr., for their annual physicals. IU did not allow an individual player to choose which physician he saw for his required annual physical examination.

36.     Mujezinovic first learned of his impending appointment with Dr. Bomba, Sr. when he entered the Hoosier men's locker room at Assembly Hall and saw his name on a board listing the dates on which each player was required to attend his physical examination and which physician he would see.

37.     When Mujezinovic's teammates saw that he was assigned to Dr. Bomba, Sr., they warned Mujezinovic to prepare for "the finger." Players also commented on the size of Dr. Bomba, Sr.'s hands and fingers. Mujezinovic did not understand his teammates' warnings and proceeded to attend his first appointment as directed by IU.

38.     At first, Dr. Bomba, Sr. appeared to perform a routine physical examination. Without warning, Dr. Bomba, Sr. then proceeded to digitally penetrate Mujezinovic's rectum under the guise of performing a prostate examination on a healthy twenty-year-old man.

39.     Based on blood test results from his first physical,[8] Mujezinovic was directed by IU to return to Dr. Bomba, Sr. for a follow-up appointment.

40.     At his second visit, Dr. Bomba, Sr. proceeded to digitally extract a stool sample from Mujezinovic, denying Mujezinovic any opportunity to provide a stool sample by other means,

---

[7] Tim Garl is currently employed by IU as its Head Men's Basketball Trainer, a position he has continuously held since 1981. Garl began working in sports medicine as a student athletic trainer in 1975 for the University of Alabama, and served on the US Olympic Committee's Sports Medicine Program, both as a sports medicine provider and later as a quality-of-care advisor. Garl served on the US Olympic Committee's Sports Medicine Committee for 25 years and was the longest serving member in the history of the program. *Tim Garl, LAT, ATC*, INDIANA UNIVERSITY (last accessed October 11, 2024), https://iuhoosiers.com/sports/mens-basketball/roster/coaches/tim-garl-lat-atc/3661.

[8] Mujezinovic suffers from thalassemia. "Thalassemia is an inherited blood disorder that causes your body to have less hemoglobin than normal. Hemoglobin enables red blood cells to carry oxygen." *Thalassemia*, MAYO CLINIC (last accessed August 27, 2024), https://www.mayoclinic.org/diseases-conditions/thalassemia/symptoms-causes/syc-20354995. Mujezinovic's appointments with Dr. Bomba, Sr. did not result in a thalassemia diagnosis. Mujezinovic was diagnosed with thalassemia by a different provider after he graduated from IU. The later diagnosis did not involve or require a rectal examination, digital or otherwise.

without the need for Dr. Bomba, Sr. to digitally penetrate his rectum.

41.     While Mujezinovic assumed the invasive, demeaning procedure was due to his abnormal blood test results, his teammates' warnings about the "finger" caused Mujezinovic to doubt the medical necessity of either of the digital rectal examinations he had endured. Over the proceeding weeks and months, Mujezinovic learned Dr. Bomba, Sr. performed the same unnecessary, invasive, harassing procedure on scores of Hoosier men's basketball players assigned to him for physical examination.

42.     IU required Mujezinovic to see Dr. Bomba, Sr. again the following year for his annual physical.

43.     While Mujezinovic waited for Dr. Bomba, Sr. to arrive in the examination room, Mujezinovic saw a bottle of KY lubricant on Dr. Bomba, Sr.'s counter. In an effort to avoid the shame and discomfort of another abusive, medically unnecessary digital rectal examination, Mujezinovic hid the bottle of lubrication on a high shelf inside a closed cabinet.

44.     When Dr. Bomba, Sr. arrived to perform Mujezinovic's physical examination and noted the bottle of KY lubricant was missing, Dr. Bomba, Sr. said to Mujezinovic, "if you'd like, we can do it without the [lubrication]." When Mujezinovic declined, Dr. Bomba, Sr. informed Mujezinovic they could "skip" the rectal examination for that year.

45.     Miller learned of his first appointment when he reported for the men's basketball training season as a seventeen-year-old freshman.

46.     Garl assigned Miller to see Dr. Bomba, Sr. for his required annual physical examination each of the four years Miller participated in the IU men's basketball program.

47.     At each physical—four over the course of his tenure with the Hoosiers—Dr. Bomba, Sr. subjected Miller to medically unnecessary, invasive, harassing, and demeaning digital

rectal examinations.

48.    Dr. Bomba, Sr.'s routine sexual assaults were openly discussed by the Hoosier men's basketball players in the locker room in the presence of IU employees, including assistant coaches, athletic trainers, and other Hoosier men's basketball staff.

49.    Dr. Bomba, Sr.'s routine sexual assaults were such common knowledge among the Hoosier team and its staff, both before and after Mujezinovic and Miller joined the team, the team and its staff referred to Dr. Bomba, Sr. as "Frankenstein" due to the large size of his hands and fingers.

50.    Dr. Bomba, Sr.'s routine sexual assaults of Mujezinovic, Miller, and their teammates subjected Mujezinovic, Miller, and their teammates to sex-based harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived Mujezinovic, Miller, and their teammates of access to the educational opportunities or benefits provided by IU.

51.    Neither Mujezinovic nor Miller knew, or had reason to know, that IU injured them until they consulted with legal counsel in 2024. As lay people without legal training, it would have been very difficult for Mujezinovic or Miller to know, or have reason to know, that IU's deliberate indifference to Dr. Bomba, Sr.'s routine sexual assaults injured them in a legally actionable way.

### E.  IU Decisionmakers Enacted and Observed a Policy of Deliberate Indifference to the Sexual Assaults Mujezinovic, Miller, and their Teammates Suffered in Violation of Title IX.

52.    Plaintiffs restate and reallege the allegations of all other paragraphs of this Class Action Complaint as if fully set forth herein.

53.    General medical guidelines have long provided that prostate examinations are recommended, at the earliest, for men aged 40 or older.[9] Indeed, in 1997, the American Cancer

---

[9] *See, e.g.*, Christian Paul Pavlovich, M.D., *Prostate Cancer Screening Ages 40 to 54*, JOHNS HOPKINS MEDICINE (last accessed October 10, 2024), https://www.hopkinsmedicine.org/health/conditions-and-diseases/prostate-

Society explained: "[i]n 1992, the American Cancer Society issued the following prostate screening recommendation: Men age 50 years and older should undergo digital rectal examination and PSA testing annually . . . . The Board of Directors of the ACS approved the following updated guideline on June 10, 1997: The ACS recommends that both the PSA test and the digital rectal examination be offered annually, beginning at age 50, to men who have a life expectancy of at least 10 years and to younger men who are at high risk." Specifically, the ACS explained, "[m]en who choose to undergo screening should begin at age 50 years. However, men in high-risk groups, such as those with a strong familial predisposition . . . may begin at a younger age (*e.g.* 45 years)."[10]

54.     There was no articulable, medically necessary reason for Dr. Bomba, Sr. to routinely perform anal, rectal or prostate examinations on healthy, highly active college student athletes.

55.     There was no articulable, medically necessary reason for Dr. Bomba, Sr. to use digital extraction by the physician to obtain a stool sample from any student athlete.[11]

56.     On information and belief, Dr. Bomba, Sr. did not perform these examinations on

---

cancer/prostate-cancer-age-specific-screening-
guidelines#:~:text=While%20the%20general%20guidelines%20recommend,who%20have%20had%20prostate%20c
ancer ("Your doctor will consider many factors before suggesting when to start prostate cancer screening . . . . While
the general guidelines recommend starting at age 55, you may need PSA screening between the ages of 40 and 54.");
*Prostate Exam*, CLEVELAND CLINIC (last accessed October 10, 2024),
https://my.clevelandclinic.org/health/diagnostics/22764-prostate-exam ("According to the American Cancer Society,
men and people who were assigned male at birth (AMAB) should have their first prostate exam by age 50. If you have
a family history of prostate cancer, you should consider having your first prostate exam at age 45.").

[10] Andrew von Eschenbach, MD *et al.*, *American Cancer Society Guideline for the Early Detection of Prostate Cancer:
Update 1997*, 47 CA – A CANCER JOURNAL FOR CLINICIANS (1997), https://scholar.archive.org/work
/4k4ie7ad6jfrpjabrnlcgjgbda/access/wayback/http:/pacificcancer.org/Resources/Cancer/Prostate/ACS_guidelines_pr
ostate.pdf.

[11] "Stool specimens collected during a [digital rectal examination] can contain red blood cells (false positive) as a
result of the collection method as opposed to a natural bowel movement. Guidelines from ICSI and the American
Cancer Society discourage collection of stool specimens during DRE . . . . According to the American Cancer Society
Colorectal Cancer Early Detection Guide (2013): An FOBIT or FIT done during a digital rectal exam in the doctor's
office is not adequate for screening. *Are stool samples collected by a digital rectal exam (DRE) allowed to be used
for the gFOBT and FIT tests?*, MN COMMUNITY MEASUREMENT (Updated 7/8/2020 10:49 AM),
https://helpdesk.mncm.org/helpdesk/KB/View/17405859-are-stool-samples-collected-by-a-digital-rectal-exam-dre-
allowed-to-be-used-for-the-gfobt-and-fit-tests-.

IU's student athletes for the benefit of his patients, but instead for improper purposes.

57.    Accordingly, Dr. Bomba's actions constituted, at minimum, battery, sexual assault, and sex-based harassment.[12]

58.    Upon information and belief, officials of IU with authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults in its programs, including athletic trainers, coaches and assistant coaches, and medical care providers.

59.    Upon information and belief, IU men's basketball athletic trainers had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults in IU's programs, and the athletic trainers had authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults. The athletic trainers had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults because IU men's basketball players routinely discussed the sexual assaults in the presence of the athletic trainers and the athletic trainers had access to the men's basketball players' medical records. The athletic trainers had the authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory assaults by ceasing assigning students to Dr. Bomba, Sr. for physical examinations.

60.    Upon information and belief, IU men's basketball coaches and assistant coaches had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults in IU's programs, and the coaches and assistant coaches had authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults. The coaches and assistant coaches had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults because (1) IU men's basketball players routinely discussed the sexual assaults in the presence of the coaches and assistant coaches, and (2) some of

---

[12] *Kansal v. Krieter*, 213 N.E.3d 573, 577 (Ind. Ct. App. 2023) (determining plaintiff's claim fell outside of Indiana's Medical Malpractice Act and noting its holding was "also consistent with this Court's other decisions addressing sexual misconduct claims against healthcare providers. We have repeatedly held that such claims are not subject to the Medical Malpractice Act.").

the assistant coaches were former IU men's basketball players who had also been victimized by Dr. Bomba, Sr.'s discriminatory sexual assaults. The coaches and assistant coaches had authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults by instructing the athletic trainers to cease assigning students to Dr. Bomba, Sr. for physical examinations or by ending the team's use of Dr. Bomba, Sr.'s medical services altogether.

61.    Upon information and belief, the IU men's basketball medical care team had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults in IU's programs, and the medical care team had authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults. Dr. Bomba, Sr. was not the only doctor contracted by IU to provide medical care to the men's basketball team—the team also used the services of other IU contracted physicians, including audiologists, orthopedic surgeons, cardiologists, and optometrists, to provide medical care to the men's basketball players. Upon information and belief, to coordinate their provision of healthcare to the men's basketball players, these physicians shared medical records with one another, including medical records containing evidence of Dr. Bomba, Sr.'s routine sexual assaults of IU men's basketball players. Further, as some of these medical providers stated in an open letter in 2016, "[o]ne of [them] was present at every practice, team meeting and game during Coach Bob Knight's tenure as Head Coach" of the IU men's basketball team, presumably also including situations in which the IU men's basketball players openly discussed Dr. Bomba, Sr.'s discriminatory sexual assaults.[13] Accordingly, the medical care team had actual knowledge of Dr. Bomba, Sr.'s routine sexual assaults of the IU men's basketball team players. The medical care team had authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults

---

[13] Zach Osterman, *IU team medical staff disputes Todd Jadlow's claims of Bob Knight abuse*, INDYSTAR (9:53 p.m. ET Oct. 31, 2016), https://www.indystar.com/story/sports/college/indiana/2016/10/31/iu-team-doctors-dispute-todd-jadlows-claims-bob-knight-abuse/93097780/.

by reporting Dr. Bomba, Sr. to the appropriate medical licensing authorities or by communicating, pursuant to their ethical duties as licensed physicians, to IU administrative personnel their concerns regarding Dr. Bomba, Sr.'s discriminatory sexual assaults.

62.     Upon information and belief, other officials at IU with authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults in its programs because IU, upon information and belief, had access to the private medical information of its student athletes, including information regarding unnecessary and abusive digital rectal examinations performed by Dr. Bomba, Sr. in the course and scope of his contract with IU.

63.     IU had control over the context in which Mujezinovic, Miller, and their teammates were subjected to Dr. Bomba, Sr.'s sexual assaults, including by contracting with Dr. Bomba, Sr. to perform IU student athletes' annual physical examinations and by requiring IU's student athletes to submit to annual physical examinations by Dr. Bomba, Sr. At all times relevant to the allegations in this Class Action Complaint, upon information and belief, Dr. Bomba, Sr. acted as an agent of IU within the course and scope of his contract with IU.

64.     IU maintained a policy of deliberate indifference to Dr. Bomba, Sr.'s routine sexual assaults of IU's student athletes, both before and after Mujezinovic and Miller played for the Hoosiers. IU failed at all times, both before and after Plaintiffs and other IU student athletes suffered Dr. Bomba, Sr.'s sexual misconduct, to take any action whatsoever to address, correct, or ensure its students were safe from Dr. Bomba, Sr.'s routine sexual assaults of IU student athletes, including Plaintiffs.

65.     IU's policy of deliberate indifference created a heightened risk of harm of sex-based harassment for Mujezinovic, Miller and other IU student athletes by requiring them to

submit to Dr. Bomba, Sr.'s sexual assaults despite its actual knowledge that requiring student athletes to submit to physical examinations with Dr. Bomba, Sr. would subject them to sexual assault.

66.     IU's policy of deliberate indifference resulted in Mujezinovic, Miller and other IU student athletes being subjected to and vulnerable to Dr. Bomba, Sr.'s sexual assaults despite its actual knowledge of Dr. Bomba, Sr.'s routine sexual misconduct.

## IV.    CLASS ACTION ALLEGATIONS

67.     Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

68.     Plaintiffs bring this action individually and on behalf of the "Class," defined as:

> All former Indiana University students who were sexually assaulted by Dr. Bradford Bomba, Sr., in the course of their participation in Indiana University's programs.

69.     **Numerosity.** Upon information and belief, the Class is so numerous that joinder of all members is impracticable. Although the exact number of and identities of individual members of the class are unknown at this time (such information being in the possession, custody, and control of IU and obtainable by Plaintiffs only through the discovery process), upon information and belief, the Class contains at least one hundred individuals.

70.     **Existence and Predominance of Common Questions of Fact and Law.** Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.   Whether IU maintained a policy of deliberate indifference which subjected the Class to a heightened risk of sexual assault by Dr. Bomba, Sr.;

b.    Whether IU maintained a policy of deliberate indifference which caused the Class to be subjected to sexual assault or made the Class more vulnerable to sexual assault by Dr. Bomba, Sr.;

c.    Whether Dr. Bomba, Sr.'s sexual misconduct amounted to discriminatory, sex-based harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the Class of access to IU's educational opportunities and benefits;

d.    Whether officials at IU with authority to take corrective actions to protect the Class from Dr. Bomba, Sr.'s routine sexual assaults had actual knowledge of Dr. Bomba's routine sexual assaults of Class Members; and

e.    Whether IU's failure to address, correct, or protect its students from Dr. Bomba, Sr.'s routine sexual assaults, both before and after those sexual assaults occurred, despite its actual knowledge of Dr. Bomba, Sr.'s sexual assaults, violated Title IX.

71.    **Typicality.** All of Plaintiffs' claims are typical of the claims of the Class since Plaintiffs and all members of the Class were subjected to sexual assault by Dr. Bomba, Sr. as a result of IU's pre- and post-assault policies of deliberate indifference to Dr. Bomba, Sr.'s discriminatory sexual assaults and sex-based harassment.  Damages are also typical of the Class because they resulted from IU's uniform wrongful conduct. Likewise, the relief to which Plaintiffs are entitled is typical of the Class because IU has acted, and refused to act, on grounds generally applicable to the Class.

72.    **Adequacy.** Plaintiffs are adequate class representatives because their interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have legal counsel competent and highly experienced in complex class action litigation, and they intend to pursue this action vigorously. Plaintiffs and their legal counsel will fairly and adequately

protect the interests of the Class. Neither Plaintiffs nor their legal counsel have any interests that are antagonistic to the interests of other members of the Class.

73.    **Superiority.** Compared to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class, a class action is the most superior. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by IU's conduct. It would be virtually impossible for Class Members individually to effectively redress the wrongs done to them. Even if the Class Members could afford such individual litigation, the court system could not. Individualized litigation presents the potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal issues of this case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, IU's records and databases.

## V.    CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF TITLE IX, 20 U.S.C. § 1681
### PRE-ASSAULT DELIBERATE INDIFFERENCE

74.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

75.    IU maintained a policy of deliberate indifference to reports, observations, and locker room conversation about Dr. Bomba, Sr.'s sexual assault, sex-based harassment, and discrimination on the basis of gender perpetrated against Plaintiffs and Class Members.

76.    IU's policy of deliberate indifference created a heightened risk of sexual assault, sex-based harassment, and discrimination on the basis of gender to Plaintiffs and Class Members

and IU had actual knowledge of this heightened risk.

77.    Dr. Bomba, Sr.'s routine sexual assault, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members occurred in a context subject to IU's control.

78.    As a direct result of IU's policy of deliberate indifference, Plaintiffs and Class Members suffered sexual assault, sex-based harassment, and discrimination on the basis of gender that was so severe, pervasive, and objectively offensive that it can be said to have deprived Plaintiffs and Class Members of access to IU's educational opportunities or benefits.

79.    Plaintiffs and Class Members are entitled to judgment against IU under Title IX for its pre-assault policy of deliberate indifference which subjected Plaintiffs and Class Members to a heightened risk of becoming victims of Dr. Bomba, Sr.'s routine sexual assault, sex-based harassment, and discrimination on the basis of gender.

## COUNT II – VIOLATION OF TITLE IX, 20 U.S.C. § 1681
### POST-ASSAULT DELIBERATE INDIFFERENCE

80.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

81.    The acts perpetrated against Plaintiffs and Class Members by Dr. Bomba, Sr. amounted to unlawful sexual assault, sex-based harassment and discrimination on the basis of gender.

82.    IU exercised substantial control over both Dr. Bomba, Sr. and the context in which Dr. Bomba, Sr. routinely committed sexual assault, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members under the guise of medical care.

83.    Plaintiffs and Class Members suffered sexual assault, sex-based harassment, and discrimination on the basis of gender by Dr. Bomba, Sr. that was so severe, pervasive, and objectively offensive that it can be said to have deprived them of access to the educational

18

opportunities or benefits offered by IU.

84.    IU had actual knowledge of Dr. Bomba, Sr.'s sexual assault, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members.

85.    IU acted with deliberate indifference to Dr. Bomba, Sr.'s sexual assault, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members.

86.    IU's deliberate indifference to Dr. Bomba, Sr.'s sexual assault, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members caused Plaintiffs and Class Members to undergo sexual assault, sex-based harassment, and discrimination on the basis of gender or made Plaintiffs and Class Members vulnerable to it.

87.    Plaintiffs and Class Members are entitled to judgment against IU for its post-assault policy of deliberate indifference to Dr. Bomba, Sr.'s routine sexual assault, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class they seek to represent, seek the following relief:

a.    An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.    Judgment in favor of Plaintiffs and Class members awarding them appropriate monetary relief, including actual damages;

c.    An order requiring IU to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

d.    A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest and expenses as allowable by law;

e.    An award of reasonable attorney's fees and costs incurred in prosecuting this action; and

f.    An award of such other and further relief as this Court may deem just and proper.

DATED: October 15, 2024                    Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney (#18604-49)
Matthew R. Gutwein (#16414-49)
Alexander J. Pantos (#36925-53)
DELANEY & DELANEY LLC
3646 Washington Blvd.
Indianapolis, IN 46205

*Attorneys for Plaintiffs and the Putative Class*

## DEMAND FOR JURY TRIAL

Plaintiffs Haris Mujezinovic and Charlie Miller, by counsel, hereby demand a trial by jury on all triable issues.

Respectfully submitted,

*/s/ Kathleen A. DeLaney*
Kathleen A. DeLaney (#18604-49)
Matthew R. Gutwein (#16414-49)
Alexander J. Pantos (#36925-53)
DELANEY & DELANEY LLC
3646 Washington Blvd.
Indianapolis, IN 46205

*Attorneys for Plaintiffs and the Putative Class*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 15, 2024, the foregoing document was served by U.S. Certified Mail, Return Receipt Requested Mail, to:

> The Trustees of Indiana University
> Attn. W. Quinn Buckner, Chair
> 107 S. Indiana Avenue
> Bloomington, IN 47405

I further certify that on October 15, 2024, the foregoing document was sent by e-mail to:

> R. Anthony Prather
> Vice President and General Counsel
> Indiana University
> prather@iu.edu

> */s/ Kathleen A. DeLaney*
> Kathleen A. DeLaney