## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HARIS MUJEZINOVIC,<br>CHARLIE MILLER, and<br>JOHN FLOWERS, individually and on<br>behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE TRUSTEES OF INDIANA<br>UNIVERSITY, and TIM GARL, in his<br>individual capacity,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Cause No. 1:24-cv-01827-RLY-MG |

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Haris Mujezinovic, Charlie Miller, and John Flowers ("Plaintiffs," "Mujezinovic," "Miller," or "Flowers"), individually and on behalf of all others similarly situated, by counsel, file this Class Action Complaint and Demand for Jury Trial against Defendants the Trustees of Indiana University ("IU") and Tim Garl ("Garl"), in his individual capacity.

## I.    INTRODUCTION

1.    Plaintiff Haris Mujezinovic is a former professional basketball player, small business owner, spouse and father. Mujezinovic played high school basketball at Amundsen High School in Chicago, Illinois, began his college basketball career at Joliet Junior College from 1993 to 1995, then transferred to Indiana University, where he played for the Hoosiers from 1995 to 1997. After graduating from Indiana University, Mujezinovic played basketball professionally in Croatia, Italy, Turkey, Greece, Slovenia, Switzerland, Russia, Bulgaria, Cyprus, Ukraine, Lithuania, and Spain. Over the course of his basketball career, Mujezinovic's hard work on and

1

off the court earned him a wide range of accolades, including winning a Junior College Championship and multiple appearances in the Euro Championship.

2.    Since retiring from professional basketball, Mujezinovic has built a family and a construction business in Bloomington, Indiana. Mujezinovic's spouse also graduated from IU and the couple have three children, one of whom now attends IU.

3.    Plaintiff Charlie Miller is a former professional basketball player, spouse, father, and founder of ATTACK Basketball Academy. Miller played high school basketball at South Miami High School in Florida. In 1994, Miller was selected as a McDonald's All-American and Florida's Gatorade Player of the Year. After graduating from high school, Miller played basketball for the Hoosiers from 1994 to 1998. After his tenure with the Hoosiers, Miller played basketball professionally across Europe and the United States, including in Finland and Switzerland from 1998-2000, and in the Continental Basketball Association with the Gary Steelheads, located in Gary, Indiana.

4.    After retiring from professional basketball, Miller founded ATTACK Basketball Academy, where he and his spouse work with boys and girls who learn the fundamentals of basketball through a holistic player development approach. Miller has four children.

5.    Plaintiff John Flowers is a former professional basketball player and father. Flowers played high school basketball at Fort Wayne Southside High School in Indiana. In 1981, Flowers was selected as a McDonald's All-American, along with Michael Jordan and Patrick Ewing. After graduating from high school, Flowers played basketball for the Hoosiers from 1981 to 1982, then transferred to the University of Nevada – Las Vegas, where he continued his college basketball career and coursework in social work through 1985. After college, Flowers played professional basketball in Israel, Greece, France, Switzerland, and Portugal. Flowers is now retired.

6.      In recent years, several high-profile cases of sports physicians victimizing student athletes have shocked the public. These disturbing stories include that of University of Michigan wrestler Tad DeLuca, who alleged Dr. Robert E. Anderson, a University of Michigan physician who worked with student athletes, repeatedly conducted unnecessary and violative prostate and genital exams on otherwise healthy collegiate students and athletes.[1] After a thorough investigation, the University of Michigan identified more than 1,000 potential victims.[2] Mr. DeLuca cited yet another physician sexual abuse scandal as the catalyst for his raising his decades-old claims against his alma matter—the case of Larry Nassar, a former USA Gymnastics doctor convicted of sexually abusing young athletes under the guise of medical treatment.[3]

7.      Mujezinovic, Miller, and Flowers, along with their former IU men's basketball teammates and other IU men's basketball players, must unfortunately add their names to the list of athletes subjected to routine, systemic sexual assaults and sex-based harassment under the guise of medical care. Mujezinovic, Miller, Flowers, their former teammates, and other IU men's basketball players—young, healthy college athletes—were routinely and repeatedly subjected to medically unnecessary, invasive, and abusive digital rectal examinations by the Hoosiers' former team physician, Dr. Bradford Bomba, Sr. ("Dr. Bomba, Sr."). Dr. Bomba, Sr. served as the IU men's basketball team physician for nearly 30 years and the U.S. Olympic Men's Basketball Team Physician under former IU Head Men's Basketball Coach Bob Knight.

8.      Mujezinovic, Miller, and Flowers, individuals without medical training who only

---

[1] *University of Michigan Faces Sex Abuse Case Against Deceased Doctor*, NATIONAL PUBLIC RADIO (September 26, 2021), https://www.npr.org/2021/09/26/1040756506/university-of-michigan-faces-sex-abuse-case-against-deceased-doctor.
[2] *U. of Michigan reaches $490M settlement over sexual abuse by a former sports doctor*, NATIONAL PUBLIC RADIO (January 19, 2022), https://www.npr.org/2022/01/19/1074071024/university-michigan-sexual-abuse-sports-doctor/
[3] Mitch Smith & Anemona Hartocollis, *Michigan State's $500 Million for Nassar Victims Dwarfs Other Settlements*, NEW YORK TIMES (May 16, 2018), https://www.nytimes.com/2018/05/16/us/larry-nassar-michigan-state-settlement.html.

recently reached the ages at which prostate examinations *are* medically necessary, now realize that the unnecessary, invasive, and abusive digital rectal examinations Dr. Bomba, Sr. performed on them when they were young, healthy college athletes constituted sexual harassment and abuse that violated Title IX and deprived them of their Constitutional Fourteenth Amendment rights to equal protection of the law.

9.     Dr. Bomba, Sr. first contracted with IU to provide medical services to its sports teams in 1962 and provided those services through 1970. In 1979, Dr. Bomba, Sr. contracted with IU to serve as the physician for the IU men's basketball program, a position he held for several decades, concluding in the late 1990s.[4]

10.     Despite its knowledge of these routine, pervasive, repeated sexual assaults, IU systemically mishandled and turned a blind eye to Dr. Bomba, Sr.'s sexual misconduct, contrary to federal regulations and the federal Constitution's protections.

11.     Despite its knowledge of these routine sexual assaults, IU's failure to take effective preventative measures allowed Dr. Bomba, Sr.'s sexually abusive behavior to persist, caused harm to students, and perpetuated a policy of deliberate indifference to and tacit acceptance of Dr. Bomba, Sr.'s sexual misconduct.

12.     IU failed to take effective preventive measures and allowed repeated harm to students, including Plaintiffs and the Class, endorsing and perpetuating a culture of deliberate indifference and tacit acceptance of Dr. Bomba, Sr.'s sexual misconduct.

13.     Dr. Bomba, Sr.'s supervisor was IU Head Men's Basketball Trainer Tim Garl. Garl had actual knowledge of and participated in Dr. Bomba, Sr.'s constitutional violations by

---

[4] *Indiana University statement on independent review*, INDIANA UNIVERSITY (Sep 11, 2024), https://news.iu.edu/live/news/37882-indiana-university-statement-on-independent-review; Daniel Flick, *IU to investigate allegations of inappropriate behavior from Hall of Fame doctor*, Indiana Daily Student (Updated Sep 12, 2024, 11:15 am).

continuing to assign IU's student athletes to Dr. Bomba, Sr. for physical examinations with knowledge that, when he did so, Dr. Bomba, Sr. would sexually assault those students.

14.    Title IX was designed to protect students—such as the Plaintiffs and the Class—from being preyed on by known sexual assailants, and the United States Constitution guarantees all American citizens equal protection of the law. Instead of receiving the benefit of these federal protections, Mujezinovic, Miller, Flowers, their former teammates, and other IU men's basketball players were forced to choose between enduring the sexual abuse Dr. Bomba, Sr. inflicted or abandoning their chance to play for a highly prestigious basketball program and complete their education at IU.

## II.    PARTIES, VENUE, AND JURISDICTION

15.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

16.    Defendant IU is a public educational institution with its flagship campus in Bloomington, Indiana.

17.    At all times relevant to this Class Action Complaint, IU has received federal funding in many forms, including federal student financial aid, and as such is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"). At all times relevant to this Class Action Complaint, IU has been contractually obligated to enforce Title IX in its programs and all IU student activities.

18.    Defendant Tim Garl ("Garl") is an individual citizen and resident of the State of Indiana and of this District. Garl lives in Bloomington, Indiana, and has been continuously employed by IU since 1981.

19.    Plaintiff Haris Mujezinovic is a citizen and resident of the State of Indiana.

Mujezinovic attended IU and participated in IU's basketball program from 1995-1997. He graduated from IU in 1997.

20. Plaintiff Charlie Miller is a citizen and resident of the State of Texas. Miller attended IU and participated in IU's basketball program from 1994-1998. He graduated from IU in 1998.

21. Plaintiff John Flowers is a citizen and resident of the State of Arizona. Flowers attended IU and participated in IU's basketball program from 1981-1982. He attended the University of Nevada – Las Vegas from 1982-1985.

22. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because Plaintiffs' claims arise under 20 U.S.C. § 1681 ("Title IX") and 42 U.S.C. § 1983.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because IU and Garl reside in this District and because a substantial part of the acts or omissions giving rise to Plaintiffs' claims occurred in this District.

### III.    FACTUAL ALLEGATIONS

### A.  History and Purpose of Title IX

24. Plaintiffs restate and reallege the allegations of all other paragraphs of this Class Action Complaint as if fully set forth herein.

25. In 1972, Congress enacted Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

26. Congress enacted Title IX with two principal objectives in mind: to avoid the use of federal resources to support discriminatory practices in education programs, and to provide

individual citizens effective protection against those practices.[5]

27.     Following its enactment, courts have interpreted Title IX to protect students from sexual assault or sex-based harassment in educational programs or activities operated by recipients of federal funding.[6] Title IX protects a student from sex-based harassment or sexual assault while the student is participating in any education program or activity at an educational institution that receives federal funding because sexual assault and sex-based harassment are inherently gender-based forms of discrimination

### B.  42 U.S.C. § 1983

28.     Plaintiffs restate and reallege the allegations of all other paragraphs of this Class Action Complaint as if fully set forth herein.

29.     Under 42 U.S.C. § 1983, an individual may bring a claim against a person acting under color of state law for a violation of the individual's federal constitutional rights, including the Fourteenth Amendment right to equal protection of the law.

30.     Well-settled Seventh Circuit precedent establishes that an official acting under color of state law who sexually abuses a student violates that student's Fourteenth Amendment equal protection rights.

31.     A state official who supervises a state actor who sexually abuses students under color of law, a long-established constitutional violation of which a reasonable person would be aware, is liable for his misconduct where, as here, the supervisor knows of the sexual abuse and facilitates, approves, encourages, condones, or turns a blind eye to it.

---

[5] U.S. DEPARTMENT OF JUSTICE, CIVIL RIGHTS DIVISION, *Title IX Legal Manual* (last accessed October 4, 2024), https://www.justice.gov/crt/title-ix#:~:text=Congress%20enacted%20Title%20IX%20with,677%2C%20704%20 (1979).
[6] *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290-91 (1998).

### C.  Mujezinovic's Career with the Hoosiers.

32.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

33.    In 1993, Mujezinovic started his college basketball career at Joliet Junior College in Joliet, Illinois.

34.    Mujezinovic played basketball at Joliet Junior College for two years, from 1993 to 1995. Mujezinovic and his teammates earned a Junior College Championship title for the 1993-1994 season.

35.    In 1994, Mujezinovic was recruited by a number of college basketball programs, including IU's. Mujezinovic considered his options and decided to commit to transferring to IU to play basketball for the Hoosiers. Mujezinovic was thrilled to join the Hoosiers' premier collegiate basketball program. Mujezinovic's participation in a successful, high profile Big 10 men's basketball program provided him with an opportunity to play for an NCAA championship caliber team and would likely open the doors to post-collegiate professional basketball opportunities.

36.    In 1995, Mujezinovic transferred to and attended IU as a student athlete and began playing basketball for the Hoosiers. At the time, Mujezinovic was twenty years old.

### D.  Miller's Career with the Hoosiers.

37.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

38.    In 1994, Miller was recruited by a number of college basketball teams, including IU's. Miller considered his options and decided to commit to attending IU to play basketball for the Hoosiers. Miller was thrilled to join the Hoosiers' premier collegiate men's basketball program. Miller's participation in a successful, high profile Big 10 basketball program provided him with

an opportunity to play for an NCAA championship caliber team and would likely open the doors to post-collegiate professional basketball opportunities.

39. In 1994, Miller began attending IU as a student athlete and playing basketball for the Hoosiers. At the time, Miller was seventeen years old.

## E.  Flowers's Career with the Hoosiers.

40. Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

41. In 1981, Flowers was recruited by a number of college basketball teams, including IU's. Flowers considered his options and decided to commit to attending IU to play basketball for the Hoosiers. Flowers was thrilled to join the Hoosiers' premier collegiate men's basketball program. Flowers's participation in a successful, high profile Big 10 basketball program provided him an opportunity to play for an NCAA championship caliber team and would likely open the doors to post-collegiate professional basketball opportunities.

42. In 1981, Flowers began attending IU as a student athlete and playing basketball for the Hoosiers. At the time, Flowers was nineteen years old.

43. In 1982, Flowers transferred to the University of Nevada – Las Vegas ("UNLV") to continue his undergraduate studies. Flowers played basketball at UNLV from 1982-1985.

## F.  IU Men's Basketball Team Doctor, Dr. Bomba, Sr., Aided by Head Men's Basketball Trainer Tim Garl, Subjects Mujezinovic, Miller, Flowers, Their Teammates and Other IU Men's Basketball Players to Repeated and Routine Sexual Assaults.

44. Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

45. Garl is currently employed by IU as its Head Men's Basketball Trainer, a position he has continuously held since 1981. Garl began working in sports medicine as a student athletic

9

trainer in 1975 for the University of Alabama, and served on the US Olympic Committee's Sports Medicine Program, both as a sports medicine provider and later as a quality-of-care advisor. Garl served on the US Olympic Committee's Sports Medicine Committee for 25 years and was the longest serving member in the history of the program.[7]

46.     Garl, at all times relevant herein, supervised the IU men's basketball medical team, including but not limited to Dr. Bomba, Sr.

47.     As a condition of continued participation in IU's basketball program, at all times relevant to the allegations herein, IU required IU men's basketball players to submit to annual physicals with doctors whom IU chose and provided.

48.     At all times relevant to the allegations herein, IU controlled the agents it hired to perform the required physicals and controlled the context in which the physicals occurred.

49.     Upon information and belief, at all times relevant to the allegations herein, IU required IU men's basketball players to authorize the agents IU hired to perform and coordinate the required physicals to share the IU men's basketball players' private health information with IU, including information regarding procedures, tests, and care provided in the course of the required physicals, as a condition of continued participation in IU's basketball program.

50.     IU's Athletic Department provided the team doctors it hired to perform the required physicals on IU men's basketball players with a form to fill out in connection with the required physical examinations.

51.     The form provided by IU's Athletic Department to team doctors contained a list of routine questions—including past medical history, present medical history, and if the patient was prone to any injuries or illnesses.

---

[7] *Tim Garl, LAT, ATC*, Indiana University (last accessed October 11, 2024), https://iuhoosiers.com/sports/mens-basketball/roster/coaches/tim-garl-lat-atc/3661.

52.     The form provided by IU's Athletic Department asked the team doctor to identify any procedures performed during the physical examination.

53.     Team doctors completed the forms and then returned the forms to IU's Athletic Department after a player's required physical examination.

54.     IU's Athletic Department maintained a "folder" for each of its men's basketball players, which was kept up-to-date with each player's injuries or illnesses. These folders also contained completed annual physical forms.

55.     IU's team doctors did not maintain separate copies of the men's basketball players' medical records of completed annual physical forms. All of the records were maintained at IU's Athletic Department.

56.     Upon their enrollment at IU and joining the basketball team, IU required Mujezinovic, Miller, and Flowers to submit to a physical examination with IU team doctor Dr. Bradford Bomba, Sr.  Garl assigned each player to Dr. Bomba, Sr. or his son, Dr. Bradford Bomba, Jr., for the player's annual physical. IU did not allow an individual player to choose which physician he saw for his required annual physical examination.

57.     Mujezinovic first learned of his impending appointment with Dr. Bomba, Sr. when he entered the Hoosier men's locker room at Assembly Hall and saw his name on a board listing the dates on which each player was required to attend his physical examination and which physician he would see.

58.     When Mujezinovic's teammates saw that he was assigned to Dr. Bomba, Sr., they warned Mujezinovic to prepare for "the finger." Players also commented on the size of Dr. Bomba, Sr.'s hands and fingers. Mujezinovic did not understand his teammates' warnings and proceeded to attend his first appointment as directed by IU.

59.     At first, Dr. Bomba, Sr. appeared to perform a routine physical examination. Without warning, Dr. Bomba, Sr. then digitally penetrated Mujezinovic's rectum under the guise of performing a prostate examination on a healthy twenty-year-old man.

60.     Based on blood test results from his first physical,[8] Mujezinovic was directed by IU to return to Dr. Bomba, Sr. for a follow-up appointment.

61.     At his second visit, Dr. Bomba, Sr. digitally extracted a stool sample from Mujezinovic, denying Mujezinovic any opportunity to provide a stool sample by other means, without the need for Dr. Bomba, Sr. to digitally penetrate his rectum.

62.     IU required Mujezinovic to see Dr. Bomba, Sr. again the following year for his annual physical.

63.     While Mujezinovic waited for Dr. Bomba, Sr. to arrive in the examination room, Mujezinovic saw a bottle of KY lubricant on Dr. Bomba, Sr.'s counter. In an effort to avoid the shame and discomfort of another digital rectal examination, Mujezinovic hid the bottle of lubrication on a high shelf inside a closed cabinet.

64.     When Dr. Bomba, Sr. arrived to perform Mujezinovic's physical examination and noted the bottle of KY lubricant was missing, Dr. Bomba, Sr. said to Mujezinovic, "if you'd like, we can do it without the [lubrication]." When Mujezinovic declined, Dr. Bomba, Sr. informed Mujezinovic they could "skip" the rectal examination for that year.

65.     At the time he was subjected to Dr. Bomba, Sr.'s digital rectal examinations, Mujezinovic did not know, or have reason to know, that the procedure was unnecessary or that it

---

[8] Mujezinovic suffers from thalassemia. "Thalassemia is an inherited blood disorder that causes your body to have less hemoglobin than normal. Hemoglobin enables red blood cells to carry oxygen." *Thalassemia*, MAYO CLINIC (last accessed August 27, 2024), https://www.mayoclinic.org/diseases-conditions/thalassemia/symptoms-causes/syc-20354995. Mujezinovic's appointments with Dr. Bomba, Sr. did not result in a thalassemia diagnosis. Mujezinovic was diagnosed with thalassemia by a different provider after he graduated from IU. The later diagnosis did not involve or require a rectal examination, digital or otherwise.

constituted sexual harassment and abuse. Mujezinovic has never received medical training and he relied on IU and its employees and agents to determine the medical testing necessary for him to participate on the IU men's basketball team.

66.    Miller learned of his first appointment when he reported for the men's basketball training season as a seventeen-year-old freshman.

67.    Garl assigned Miller to see Dr. Bomba, Sr. for his required annual physical examination each of the four years Miller participated in the IU men's basketball program.

68.    At each physical—four over the course of his tenure with the Hoosiers—Dr. Bomba, Sr. subjected Miller to medically unnecessary, invasive, harassing, and demeaning digital rectal examinations.

69.    At the time he was subjected to Dr. Bomba, Sr.'s digital rectal examinations, Miller did not know, or have reason to know, that the procedure was unnecessary or that it constituted sexual harassment and abuse. Miller has never received medical training and he relied on IU and its employees and agents to determine the medical testing necessary for him to participate on the IU men's basketball team.

70.    Flowers learned of his first appointment with Dr. Bomba, Sr. when he reported for the men's basketball training season as a nineteen-year-old freshman.

71.    Garl assigned Flowers to see Dr. Bomba, Sr. for his required annual physical examination each of the two years Flowers participated in the IU men's basketball program.

72.    At each physical, Dr. Bomba, Sr. subjected Flowers to medically unnecessary, invasive, harassing, and demeaning digital rectal examinations.

73.    After his first physical, Flowers's teammates told him he had "passed" Dr. Bomba, Sr.'s "test," and that he would not have to undergo a digital rectal examination again. Garl laughed

at Flowers and his freshman teammates and made jokes at their expense regarding the digital rectal examinations they endured.

74.    When Flowers attended his required physical examination for his sophomore year, despite his teammates' assurances, he was again required to endure a medically unnecessary, invasive, harassing, and demeaning digital rectal examination.

75.    At the time he was subjected to Dr. Bomba, Sr.'s digital rectal examinations, Flowers did not know, or have reason to know, that the procedure was unnecessary or that it constituted sexual harassment and abuse. Flowers has never received medical training and he relied on IU and its employees and agents to determine the medical testing necessary for him to participate on the IU men's basketball team.

76.    Garl was at all times relevant herein aware of Dr. Bomba, Sr.'s sexual abuse, but continued to condone, facilitate, and approve Dr. Bomba, Sr.'s constitutional violations of the IU men's basketball players by continuing to assign those players to receive physical examinations from Dr. Bomba, Sr.

77.    Garl was at all times relevant herein aware that the digital rectal examinations Dr. Bomba, Sr. routinely performed on young, healthy collegiate athletes were medically unnecessary because Garl has worked as a medical professional in the sports medicine field since, at least, 1975. Mujezinovic, Miller and Flowers were unaware that Dr. Bomba, Sr.'s actions constituted sexual assault and harassment or that officials with authority to correct Dr. Bomba, Sr.'s wrongful actions had actual knowledge of Dr. Bomba, Sr.'s routine sexual assaults of IU men's basketball players.

78.    Dr. Bomba, Sr.'s routine sexual assaults were openly discussed by the Hoosier men's basketball players in the locker room in the presence of IU employees, including assistant coaches, athletic trainers, and other Hoosier men's basketball staff.

79.    Dr. Bomba, Sr.'s routine sexual assaults were such common knowledge among the Hoosier team and its staff, both before and after Mujezinovic, Miller, and Flowers joined the team, the team and its staff referred to Dr. Bomba, Sr. as "Frankenstein" due to the large size of his hands and fingers—even though the players did not then realize Dr. Bomba, Sr.'s digital rectal examinations constituted sexual harassment and abuse.

80.    Plaintiffs reasonably believed that, because Dr. Bomba, Sr.'s conduct was so widely known and openly discussed, it could not have constituted sexual abuse.

81.    Plaintiffs reasonably believed that IU would not have contracted Dr. Bomba, Sr. as a team physician for a top-flight, elite basketball program unless his examinations were legitimate, including the routine digital rectal examinations he performed on IU student athletes.

82.    Plaintiffs, individuals without medical training, lacked information about what procedures are medically appropriate and necessary in the context of physical examinations. While it is normal for medical procedures to include nudity and discomfort, physicians are in a position of superior knowledge and authority to patients. Dr. Bomba, Sr.'s routine digital rectal examinations made Plaintiffs uncomfortable, but Plaintiffs reasonably relied on IU, Garl, and Dr. Bomba, Sr. to determine what procedures were medically appropriate and necessary, and therefore reasonably believed Dr. Bomba, Sr.'s routine digital rectal examinations were medically appropriate and necessary.

83.    IU and Garl, by contracting Dr. Bomba, Sr. to act as a team physician and by continuing to assign student athletes to receive their required annual physical examinations from Dr. Bomba, Sr., provided their "stamp of approval" for Dr. Bomba, Sr.'s conduct. IU and Garl's implicit and explicit approval of Dr. Bomba, Sr.'s conduct bolstered Plaintiffs' belief that Dr. Bomba, Sr.'s conduct was normal and medically necessary.

15

84.    IU, Garl, and Dr. Bomba, Sr.'s actions caused Plaintiffs to reasonably believe the digital rectal examinations Dr. Bomba, Sr. routinely performed on healthy college athletes were a normal and necessary part of annual physical examinations for elite athletes. IU, Garl, and Dr. Bomba, Sr.'s pretextual explanation of Dr. Bomba, Sr.'s conduct—that it was part of normal annual physical examinations—bolstered Plaintiffs' belief that Dr. Bomba, Sr.'s conduct was normal and medically necessary.

85.    Mujezinovic did not know that Dr. Bomba, Sr.'s routine digital rectal examinations of him constituted sexual misconduct until he discussed the physical examinations with a former teammate and legal counsel in 2024.

86.    Miller did not know that Dr. Bomba, Sr.'s routine digital rectal examinations of him constituted sexual misconduct until he received a phone call from a former teammate on September 16, 2024. Miller and his former teammate discussed a press release IU promulgated in September 2024 regarding the allegations herein.

87.    Flowers did not suspect that Dr. Bomba, Sr.'s routine digital rectal examinations of him constituted sexual misconduct until he discussed the examinations with his cousin in early 2024. Flowers's cousin also played for the IU men's basketball team and suffered the same treatment from Dr. Bomba, Sr. Shortly thereafter, Flowers learned of the present lawsuit, which solidified his early 2024 suspicion that Dr. Bomba, Sr.'s actions constituted sexual assault.

88.    Dr. Bomba, Sr.'s routine sexual assaults of Mujezinovic, Miller, Flowers, their teammates, and other IU men's basketball players subjected Mujezinovic, Miller, Flowers, their teammates, and other IU men's basketball players to sex-based harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived Mujezinovic, Miller, Flowers, their teammates, and other IU men's basketball players of access to the educational

opportunities or benefits provided by IU.

**G. IU Decisionmakers Enacted and Observed a Policy of Deliberate Indifference to the Sexual Assaults Mujezinovic, Miller, Flowers, and Other IU Men's Basketball Players Suffered in Violation of Title IX.**

89.    Plaintiffs restate and reallege the allegations of all other paragraphs of this Class Action Complaint as if fully set forth herein.

90.    General medical guidelines have long provided that prostate examinations are recommended, at the earliest, for men aged 40 or older.[9] Indeed, in 1997, the American Cancer Society explained: "[i]n 1992, the American Cancer Society issued the following prostate screening recommendation: Men age 50 years and older should undergo digital rectal examination and PSA testing annually . . . . The Board of Directors of the ACS approved the following updated guideline on June 10, 1997: The ACS recommends that both the PSA test and the digital rectal examination be offered annually, beginning at age 50, to men who have a life expectancy of at least 10 years and to younger men who are at high risk." Specifically, the ACS explained, "[m]en who choose to undergo screening should begin at age 50 years. However, men in high-risk groups, such as those with a strong familial predisposition . . . may begin at a younger age (*e.g.* 45 years)."[10]

91.    There was no articulable, medically necessary reason for Dr. Bomba, Sr. to routinely perform anal, rectal or prostate examinations on healthy, highly active college student

---

[9] *See, e.g.*, Christian Paul Pavlovich, M.D., *Prostate Cancer Screening Ages 40 to 54*, JOHNS HOPKINS MEDICINE (last accessed October 10, 2024), https://www.hopkinsmedicine.org/health/conditions-and-diseases/prostate-cancer/prostate-cancer-age-specific-screening-guidelines#:~:text=While%20the%20general%20guidelines%20recommend,who%20have%20had%20prostate%20cancer ("Your doctor will consider many factors before suggesting when to start prostate cancer screening . . . . While the general guidelines recommend starting at age 55, you may need PSA screening between the ages of 40 and 54."); *Prostate Exam*, CLEVELAND CLINIC (last accessed October 10, 2024), https://my.clevelandclinic.org/health/diagnostics/22764-prostate-exam ("According to the American Cancer Society, men and people who were assigned male at birth (AMAB) should have their first prostate exam by age 50. If you have a family history of prostate cancer, you should consider having your first prostate exam at age 45.").
[10] Andrew von Eschenbach, MD *et al.*, *American Cancer Society Guideline for the Early Detection of Prostate Cancer: Update 1997*, 47 CA – A CANCER JOURNAL FOR CLINICIANS (1997), https://scholar.archive.org/work/4k4ie7ad6jfrpjabrnlcgjgbda/access/wayback/http:/pacificcancer.org/Resources/Cancer/Prostate/ACS_guidelines_prostate.pdf.

athletes.

92.    There was no articulable, medically necessary reason for Dr. Bomba, Sr. to use digital extraction by the physician to obtain a stool sample from any student athlete.[11]

93.    On information and belief, Dr. Bomba, Sr. did not perform these examinations on IU's student athletes for the benefit of his patients, but instead for improper purposes.

94.    Accordingly, Dr. Bomba's actions constituted, at minimum, battery, sexual assault, and sex-based harassment.

95.    Officials of IU with authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults, including Garl, had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults in its programs.

96.    Since 1981, Garl has supervised the IU men's basketball medical team, including Dr. Bomba, Sr. Garl had knowledge, at all relevant times, that Dr. Bomba, Sr. was routinely subjecting IU men's basketball players to discriminatory sexual assaults in IU's programs, and, as Dr. Bomba, Sr.'s supervisor, Garl had authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults.

97.    Upon information and belief, other officials at IU with authority to take corrective action to end Dr. Bomba, Sr.'s discriminatory sexual assaults had actual knowledge of Dr. Bomba, Sr.'s discriminatory sexual assaults in its programs because IU had access to the private medical information of its student athletes, including information regarding unnecessary and abusive

---

[11] "Stool specimens collected during a [digital rectal examination] can contain red blood cells (false positive) as a result of the collection method as opposed to a natural bowel movement. Guidelines from ICSI and the American Cancer Society discourage collection of stool specimens during DRE . . . . According to the American Cancer Society Colorectal Cancer Early Detection Guide (2013): An FOBIT or FIT done during a digital rectal exam in the doctor's office is not adequate for screening." *Are stool samples collected by a digital rectal exam (DRE) allowed to be used for the gFOBT and FIT tests?*, MN COMMUNITY MEASUREMENT (Updated 7/8/2020 10:49 AM), https://helpdesk.mncm.org/helpdesk/KB/View/17405859-are-stool-samples-collected-by-a-digital-rectal-exam-dre-allowed-to-be-used-for-the-gfobt-and-fit-tests-.

digital rectal examinations performed by Dr. Bomba, Sr. in the course and scope of his contract with IU.

98.    IU had control over the context in which Mujezinovic, Miller, Flowers, their teammates, and other IU men's basketball players were subjected to Dr. Bomba, Sr.'s sexual assaults, including by contracting with Dr. Bomba, Sr. to perform IU student athletes' annual physical examinations and by requiring IU's student athletes to submit to annual physical examinations by Dr. Bomba, Sr.

99.    Dr. Bomba, Sr. performed physical examinations on IU men's basketball players on IU's Bloomington campus—either at the university gym or in Assembly Hall.

100.    At all times relevant to the allegations in this Class Action Complaint, upon information and belief, Dr. Bomba, Sr. acted as an agent of IU within the course and scope of his contract with IU.

101.    IU maintained a policy of deliberate indifference to Dr. Bomba, Sr.'s routine sexual assaults of IU's student athletes, both before and after Mujezinovic, Miller, Flowers, their teammates, and other IU men's basketball players played for the Hoosiers. IU failed at all times, both before and after Plaintiffs and the Class suffered Dr. Bomba, Sr.'s sexual misconduct, to take appropriate action to address, correct, or ensure its students were safe from Dr. Bomba, Sr.'s routine sexual assaults of IU student athletes, including Plaintiffs and members of the Class.

102.    IU's policy of deliberate indifference created a heightened risk of harm of sex-based harassment for Mujezinovic, Miller, Flowers, their teammates, and other IU men's basketball players by requiring them to submit to Dr. Bomba, Sr.'s sexual assaults despite its actual knowledge that requiring student athletes to submit to physical examinations with Dr. Bomba, Sr. would subject them to sexual assault.

103.    IU's policy of deliberate indifference resulted in Mujezinovic, Miller, Flowers, their teammates, and other IU men's basketball players being subjected to and vulnerable to Dr. Bomba, Sr.'s sexual assaults despite its actual knowledge of Dr. Bomba, Sr.'s routine sexual misconduct.

104.    Plaintiffs did not know, or have reason to know, until 2024 that officials of IU with authority to take corrective action knew of Dr. Bomba, Sr.'s misconduct and failed to respond appropriately, and therefore that IU's deliberate indifference to Dr. Bomba, Sr.'s misconduct caused injury to Plaintiffs and the Class.

105.    Dr. Bomba, Sr. sexually assaulted only male students by subjecting them to medically unnecessary digital rectal examinations. Garl was, at all times relevant herein, aware that Dr. Bomba, Sr. sexually assaulted only male students by subjecting them to medically unnecessary digital rectal examinations.

## IV.    CLASS ACTION ALLEGATIONS

106.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

107.    Plaintiffs bring this action individually and on behalf of the "Class," defined as:

> All former Indiana University men's basketball players who were sexually assaulted by Dr. Bradford Bomba, Sr., in the course of their participation in Indiana University's programs.

108.    **Numerosity.** Upon information and belief, the Class is so numerous that joinder of all members is impracticable. Although the exact number of and identities of individual members of the class are unknown at this time (such information is in the possession, custody, and control of IU and obtainable by Plaintiffs only through the discovery process), upon information and belief, the Class contains at least one hundred individuals.

109.    **Existence and Predominance of Common Questions of Fact and Law.** Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.    Whether IU maintained a policy of deliberate indifference which subjected the Class to a heightened risk of sexual assaults by Dr. Bomba, Sr.;

b.    Whether IU maintained a policy of deliberate indifference which caused the Class to be subjected to sexual assaults or made the Class more vulnerable to sexual assaults by Dr. Bomba, Sr.;

c.    Whether Dr. Bomba, Sr.'s sexual misconduct amounted to discriminatory, sex-based harassment that was so severe, pervasive, and objectively offensive that it can be said to have deprived the Class of access to IU's educational opportunities and benefits;

d.    Whether officials at IU with authority to take corrective actions to protect the Class from Dr. Bomba, Sr.'s routine sexual assaults had actual knowledge of Dr. Bomba's routine sexual assaults of Class Members;

e.    Whether Garl's actions subject him to supervisory liability under 42 U.S.C. § 1983 for condoning, facilitating, encouraging, and approving Dr. Bomba, Sr.'s routine discriminatory sexual assaults of IU's men's basketball student athletes; and

f.    Whether IU's failure to address, correct, or protect its students from Dr. Bomba, Sr.'s routine sexual assaults, both before and after those sexual assaults occurred, despite its actual knowledge of Dr. Bomba, Sr.'s sexual assaults, violated Title IX.

110.    **Typicality.** All of Plaintiffs' claims are typical of the claims of the Class because Plaintiffs and all members of the Class were subjected to sexual assaults by Dr. Bomba, Sr. as a

21

result of IU's pre- and post-assault policies of deliberate indifference to, and Garl's active participation in, Dr. Bomba, Sr.'s discriminatory sexual assaults and sex-based harassment. Damages are also typical of the Class because they resulted from IU and Garl's uniform wrongful conduct. Likewise, the relief to which Plaintiffs are entitled is typical of the Class because IU and Garl have acted, and refused to act, on grounds generally applicable to the Class.

111.    **Adequacy.** Plaintiffs are adequate class representatives because their interests do not materially or irreconcilably conflict with the interests of the Class they seek to represent, they have legal counsel competent and highly experienced in complex class action litigation, and they intend to pursue this action vigorously. Plaintiffs and their legal counsel will fairly and adequately protect the interests of the Class. Neither Plaintiffs nor their legal counsel have any interests that are antagonistic to the interests of other members of the Class.

112.    **Superiority.** Compared to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class, a class action is the most superior. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by IU and Garl's conduct. It would be virtually impossible for Class Members individually to effectively redress the wrongs done to them. Even if the Class Members could afford such individual litigation, the court system could not. Individualized litigation presents the potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal issues of this case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, IU's records and databases.

## V.    CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF TITLE IX, 20 U.S.C. § 1681
### PRE-ASSAULT DELIBERATE INDIFFERENCE (AGAINST THE TRUSTEES OF INDIANA UNIVERSITY)

113.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

114.    IU maintained a policy of deliberate indifference to reports, observations, and locker room conversation about Dr. Bomba, Sr.'s sexual assaults, sex-based harassment, and discrimination on the basis of gender perpetrated against Plaintiffs and Class Members.

115.    IU's policy of deliberate indifference created a heightened risk of sexual assaults, sex-based harassment, and discrimination on the basis of gender to Plaintiffs and Class Members and IU had actual knowledge of this heightened risk.

116.    Dr. Bomba, Sr.'s routine sexual assaults, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members occurred in a context subject to IU's control.

117.    As a direct result of IU's policy of deliberate indifference, Plaintiffs and Class Members suffered sexual assaults, sex-based harassment, and discrimination on the basis of gender that was so severe, pervasive, and objectively offensive that it can be said to have deprived Plaintiffs and Class Members of access to IU's educational opportunities or benefits.

118.    Plaintiffs and Class Members are entitled to judgment against IU under Title IX for its pre-assault policy of deliberate indifference which subjected Plaintiffs and Class Members to a heightened risk of becoming victims of Dr. Bomba, Sr.'s routine sexual assaults, sex-based harassment, and discrimination on the basis of gender.

**COUNT II – VIOLATION OF TITLE IX, 20 U.S.C. § 1681
POST-ASSAULT DELIBERATE INDIFFERENCE (AGAINST THE TRUSTEES OF
INDIANA UNIVERSITY)**

119.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

120.    The acts perpetrated against Plaintiffs and Class Members by Dr. Bomba, Sr. amounted to unlawful sexual assaults, sex-based harassment and discrimination on the basis of gender.

121.    IU exercised substantial control over both Dr. Bomba, Sr. and the context in which Dr. Bomba, Sr. routinely committed sexual assaults, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members under the guise of medical care.

122.    Plaintiffs and Class Members suffered sexual assaults, sex-based harassment, and discrimination on the basis of gender by Dr. Bomba, Sr. that was so severe, pervasive, and objectively offensive that it can be said to have deprived them of access to the educational opportunities or benefits offered by IU.

123.    IU had actual knowledge of Dr. Bomba, Sr.'s sexual assaults, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members.

124.    IU acted with deliberate indifference to Dr. Bomba, Sr.'s sexual assaults, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members.

125.    IU's deliberate indifference to Dr. Bomba, Sr.'s sexual assaults, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members caused Plaintiffs and Class Members to undergo sexual assaults, sex-based harassment, and discrimination on the basis of gender or made Plaintiffs and Class Members vulnerable to it.

126.    Plaintiffs and Class Members are entitled to judgment against IU for its post-assault

policy of deliberate indifference to Dr. Bomba, Sr.'s routine sexual assaults, sex-based harassment, and discrimination on the basis of gender of Plaintiffs and Class Members.

### COUNT III – VIOLATION OF 42 U.S.C. § 1983
### (AGAINST GARL IN HIS INDIVIDUAL CAPACITY)

127.    Plaintiffs restate and reallege the allegations in all other paragraphs of this Class Action Complaint as if fully set forth herein.

128.    Sexual assault and harassment by a state actor constitute sex discrimination in violation of the equal protection clause of the Fourteenth Amendment.[12]

129.    Indiana University is a university of the State of Indiana. IC § 21-20-2-1.

130.    Dr. Bomba, Sr. was acting as an agent of Indiana University when he performed physical examinations on Indiana University's student athletes. At all times relevant herein, Dr. Bomba, Sr. was acting under color of state law.

131.    Garl has been continuously employed by Indiana University since 1981 as the Head Men's Basketball Trainer. At all times relevant to the allegations against Garl herein, Garl supervised Dr. Bomba, Sr. and acted under color of state law.

132.    Dr. Bomba, Sr. deprived Plaintiffs of the benefit of their Fourteenth Amendment right to equal protection of the law when he repeatedly and systematically subjected them to discriminatory sexual assaults.

133.    Garl violated 42 U.S.C. § 1983 when he facilitated, encouraged, condoned, and accepted Dr. Bomba, Sr.'s routine constitutional deprivations by knowingly and repeatedly subjecting Plaintiffs to Dr. Bomba, Sr.'s routine discriminatory sexual assaults and ridiculing Plaintiffs for having endured them.

---

[12] *Bohen v. East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986) (citing, *inter alia*, *Woerner v. Brzeczek*, 519 F. Supp. 517, 519-20 (N.D. Ill. 1981)).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Class they seek to represent, seek the following relief:

a.      An order certifying this action as a Class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b.      Judgment in favor of Plaintiffs and Class members awarding them appropriate monetary relief, including actual damages, compensatory damages, and emotional distress damages;

c.      An order requiring IU to pay the costs involved in notifying Class Members about the judgment and administering the claims process;

d.      A judgment in favor of Plaintiffs and Class Members awarding them prejudgment and post-judgment interest and expenses as allowable by law;

e.      An award of reasonable attorney's fees and costs incurred in prosecuting this action; and

f.      An award of such other and further relief as this Court may deem just and proper.

DATED: January 14, 2025                        Respectfully submitted,

                                               */s/ Kathleen A. DeLaney*
                                               Kathleen A. DeLaney (#18604-49)
                                               Matthew R. Gutwein (#16414-49)
                                               Alexander J. Pantos (#36925-53)
                                               DELANEY & DELANEY LLC
                                               3646 Washington Blvd.
                                               Indianapolis, IN 46205

                                               *Attorneys for Plaintiffs and the Putative Class*

## DEMAND FOR JURY TRIAL

  Plaintiffs Haris Mujezinovic, Charlie Miller, and John Flowers, by counsel, and on behalf of the Class that they seek to represent hereby demand a trial by jury on all triable issues.

         Respectfully submitted,


        */s/ Kathleen A. DeLaney*
        Kathleen A. DeLaney (#18604-49)
        Matthew R. Gutwein (#16414-49)
        Alexander J. Pantos (#36925-53)
        DELANEY & DELANEY LLC
        3646 Washington Blvd.
        Indianapolis, IN 46205

        *Attorneys for Plaintiffs and the Putative Class*