**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

HARIS MUJEZINOVIC individually and on )
behalf of all others similarly situated, )
CHARLIE MILLER individually and on behalf of )
all others similarly situated, )
JOHN FLOWERS, )
LARRY RICHARDSON, JR., )
                                       )
              Plaintiffs, )
                                       )
       v. )        Case No. 1:24-cv-01827-TWP-MG
                                       )
TRUSTEES OF INDIANA UNIVERSITY, )
TIM GARL, )
                                       )
              Defendants. )
                                       )
_____ )
                                       )
JOSEPH T. BOMBA, )
                                       )
              Interested Party. )

**ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS**

This matter is before the Court on Motions to Dismiss filed pursuant to Federal Rule of

Civil Procedure 12(b)(6) by Defendant the Trustees of Indiana University (the "University")

(Filing No. 142) and pursuant to Rules 12(b)(1) and 12(b)(6) by Defendant Tim Garl ("Garl")

(Filing No. 140) (together, "Defendants"). Plaintiffs Haris Mujezinovic ("Mujezinovic"), Charlie

Miller ("Miller"), John Flowers ("Flowers"), and Larry Richardson Jr. ("Richardson"),

(collectively, "Plaintiffs"), all attended Indiana University ("IU") in the 1980s and 1990s and

played on the men's basketball team. Sadly, each of these men was subjected to unnecessary,

invasive, and traumatic rectal  examinations by team doctor Joseph T. Bomba, Sr. ("Bomba"). In

2024, Plaintiffs initiated this putative class action against the University and the Head Men's

Basketball Trainer (and Bomba's supervisor), Garl, alleging that Defendants had knowledge of

Bomba's years-long abuse yet did nothing to stop it. Plaintiffs assert claims against the University under Title IX of the Educational Amendments Act of 1972, 20 U.S.C. §§ 1681–89 ("Title IX"), against Garl under 42 U.S.C. § 1983 ("Section 1983") for violations of the Fourteenth Amendment, and against both Defendants under Indiana state law. Defendants move to dismiss Plaintiffs' federal and state law claims on several grounds. For the reasons explained below, the Court **grants** both Motions to Dismiss because Plaintiffs' federal claims are time barred and because the Court relinquishes supplemental jurisdiction over the remaining state law claims.

## I.     <u>BACKGROUND</u>

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the Complaint and draws all inferences in favor of Plaintiffs as the non-moving parties. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008). These background facts are not intended to provide a comprehensive explanation of all the facts presented in this case; rather, they provide the background relevant to the issues before the Court.

Plaintiffs and their teammates must unfortunately add their names to an ever-growing list of student-athletes who were subjected to "routine, systemic sexual assaults and sex-based harassment under the guise of medical care." (Filing No. 132 ¶¶ 7–8). Flowers (1981–82), Miller (1994–98), Mujezinovic (1995–97), and Richardson (1995–2000) all played basketball for IU. *Id.* ¶¶ 1–6. All were abused by Bomba, who served as IU's team physician for nearly thirty years. IU first contracted with Bomba in 1962 to provide medical services to all its sports teams, which he did until 1970. In 1979, IU contracted with Bomba to serve as the men's basketball team physician, a position he held for several decades. *Id.* ¶¶ 9–10. Bomba's supervisor was Defendant Garl, who was (and remains) IU's Head Men's Basketball Trainer. *Id.* ¶¶ 51–52.

Physical examinations were an unavoidable part of participating on IU men's basketball team. As a condition for participation in any sports program, students were required to submit to annual physical examinations with doctors chosen and provided by IU. *Id.* ¶¶ 55–60. Students' medical information, including annual physical examination forms, were maintained by the IU Athletics Department. *Id.* ¶¶ 61–63. IU did not allow its players to choose their physicians. *Id.* ¶ 69. Garl assigned each men's basketball player to a physician (Bomba being one) and Mujezinovic, Miller, Flowers, and Richardson were each assigned to Bomba. Plaintiffs were therefore forced to choose between enduring Bomba's examinations or "abandoning their chance to play for a highly prestigious basketball program and complete their education." *Id.* ¶ 15.

In 1979 (before Plaintiffs attended IU), an unnamed men's basketball player complained about Bomba's penetrative rectal examinations to then-Head Coach Bob Knight ("Knight"), then-athletic trainer Bob Young ("Young"), and former University football player George Taliaferro ("Taliaferro") who then worked in the President's Office. *Id.* ¶ 64. Knight responded that the player was required to attend a physical and took no action to address the player's complaints. Young assured the player that anal penetration was part of a "normal exam." Taliaferro only responded that Bomba was "a piece of sh[*]t." *Id.* ¶¶ 65–68.

Plaintiffs allege that Knight, Young, and Taliaferro were all "officials with authority to take corrective action to end Dr. Bomba's discriminatory sexual assaults," but despite having knowledge of Bomba's conduct as early as 1979, none of them took any action. *Id.* ¶¶ 120–21. Plaintiffs also allege that other officials "with authority to take corrective action" knew of the alleged assaults "by means of their access to student-athletes' medical records" but likewise took no action. *Id.* ¶ 122.

3

In 1981, as a nineteen-year-old freshman, Flowers was assigned to see Bomba. Garl assigned Flowers to see Bomba for both of his annual physical examinations during Flowers' two years at IU. During each examination, Bomba subjected Flowers to "medically unnecessary, invasive, harassing, and demeaning digital rectal penetration." *Id.* ¶¶ 83–85. After this first physical, Flowers' teammates told him he had "passed" Bomba's "test" and would not have to undergo the penetration again. "Garl laughed at Flowers and his freshman teammates and made jokes at their expense regarding the digital rectal penetration they were forced to endure." *Id.* ¶ 86. The next year, despite his teammates' "assurances," Flowers was again forced to endure Bomba's penetrative rectal examination. *Id.* ¶ 87.

Miller was first assigned to see Bomba in 1994, when he was seventeen years old. As he did with Flowers, Garl assigned Miller to see Bomba for all his annual physical examinations. At each of his four physical examinations, Miller was subjected to the same "medically unnecessary, invasive, harassing, and demeaning" penetration as Flowers. *Id.* ¶¶ 79–81.

Mujezinovic learned of his first appointment with Bomba in 1995, upon entering the men's locker room and seeing his name next to Bomba's on the schedule for physical examinations. When Mujezinovic's teammates saw that he was assigned to Bomba, they "warned Mujezinovic to prepare for 'the finger.' Players also commented on the size of Dr. Bomba, Sr.'s hands and fingers," although Mujezinovic did not understand these comments at the time. *Id.* ¶ 71. Mujezinovic's physical examination  was at first routine, but "[w]ithout warning, [Bomba] digitally penetrated Mujezinovic's rectum under the guise of performing a prostate examination." *Id.* ¶ 72. Mujezinovic was later directed by IU to see Bomba for a follow-up appointment, during which Bomba "digitally extracted a stool sample from Mujezinovic" without giving Mujezinovic an opportunity to provide the sample by other less invasive means. *Id.* ¶ 74. The next year, IU again required Mujezinovic to

4

see Bomba. While waiting in the examination room, Mujezinovic hid a bottle of lubricant sitting on the counter "[i]n an effort to avoid the shame and discomfort of another digital rectal penetration." *Id.* ¶¶ 75–76. When Bomba arrived, he noticed the missing bottle. Bomba offered to proceed with a rectal examination without lubricant, but when Mujezinovic declined, Bomba said "they could 'skip' the rectal penetration for that year." *Id.* ¶ 77.

Richardson was likewise assigned his first appointment with Bomba as a freshman in 1995. Garl assigned Richardson to see Bomba for each of his five physical examinations at IU, and, like his teammates, Richardson underwent Bomba's rectal examination each time. Before his first examination, one of Richardson's teammates said, "[o]h boy, get ready," but did not tell Richardson what to expect. And when Richardson returned, the teammate asked, "he got you, didn't he? He put two big ole fingers up [your anus] and twist[ed] them around, didn't he?" *Id.* ¶¶ 89–92.

At the time they were subjected to Bomba's digital rectal penetrations, Plaintiffs did not know or have reason to know that the penetration was unnecessary or that it may constitute sexual harassment and abuse. *Id.* ¶¶ 78, 81, 88, 93. According to Plaintiffs, Bomba did not digitally penetrate male student-athletes for their own benefit, and instead did so for "improper purposes." *Id.* ¶ 116. Bomba did not subject female student-athletes to the same conduct. *Id.* ¶ 95.

Before, during, and after Plaintiffs attended IU, Bomba's conduct was "openly discussed by the Hoosier men's basketball players in the locker room in the presence of [University] employees, including assistant coaches, athletic trainers, and other Hoosier men's basketball staff." *Id.* ¶ 100. Students and staff often referred to Bomba as "Frankenstein" due to the large size of his hands and fingers. *Id.* ¶ 101. Because Bomba's conduct "was so widely known and openly discussed," Plaintiffs believed that the conduct could not have been sexual abuse. *Id.* ¶ 102. Plaintiffs thought that IU would not have contracted with Bomba to be the team physician unless

5

his examinations, including the rectal penetrations, were legitimate. *Id.* ¶ 103. Although Bomba's examinations "made Plaintiffs uncomfortable," they relied on Bomba, and the University and Garl—who had given Bomba their "stamp of approval" by retaining him—to "determine what procedures were medically appropriate and necessary." *Id.* ¶ 104–05.

Plaintiffs allege that "[o]fficials of the University with authority to take correcting action to end [Bomba's] discriminatory sexual assaults, including Garl," knew that Bomba was abusing male student-athletes but failed to prevent it. *Id.* ¶¶ 99, 118–19. Garl allegedly knew not only what Bomba was doing to players, but also knew that it was abusive, as "Garl has worked as a medical professional in the sports medicine field since, at least, 1975." *Id.* ¶¶ 95, 99. Garl "continued to condone, facilitate, and approve Dr. Bomba, Sr.'s . . . violations of the [IU] men's basketball players by continuing to assign those players to receive physical examinations from Dr. Bomba, Sr." *Id.* ¶¶ 95–96. Garl kept assigning players to Bomba "because Garl thought the players' injuries were humorous and because Garl considered the players enduring Dr. Bomba, Sr.'s sexual assaults to be a rite of passage or hazing for the men's basketball players." *Id.* ¶¶ 98, 168.

Plaintiffs now understand that the rectal examinations to which Bomba subjected them "constituted sexual harassment and abuse that violated Title IX, deprived them of their Constitutional Fourteenth Amendment rights to due process and equal protection of the law, and resulted in tortious conduct against them," were unnecessary, invasive, and abusive. *Id.* ¶ 9.

Mujezinovic did not know that Bomba's routine digital rectal penetration of him constituted sexual misconduct until he discussed the physical examinations with a former teammate and legal counsel in 2024. *Id.* at ¶107. Miller did not know that Dr. Bomba, Sr.'s routine digital rectal penetration of him constituted sexual misconduct until he received a phone call from a former teammate in September  2024 and his former teammate discussed a press release IU

promulgated in September 2024 regarding the allegations herein, *Id*. at ¶ 108.  Flowers did not suspect that Bomba's routine digital rectal penetration of him constituted sexual misconduct until he discussed the examinations with his cousin in early 2024 and after learning of this lawsuit, his suspicion that Bomba's actions constituted sexual assault was solidified. *Id*. at ¶ 109. Richardson did not know that Bomba's routine digital rectal penetration of him constituted sexual misconduct until he received a phone call from a former teammate on March 3, 2025. *Id*. at ¶ 110.

Mujezinovic and Miller initiated this action in October 2024, asserting only Title IX claims against the University (Filing No. 1). The University moved to dismiss the Complaint (Filing No. 57), and in response, Plaintiffs filed their First Amended Complaint, which added Flowers as a Plaintiff, added Garl as a Defendant, and added Section 1983 claims against Garl (Filing No. 69). Defendants again moved to dismiss Plaintiffs' claims (Filing No. 92; Filing No. 94), and Plaintiffs moved for leave to again amend their complaint. Plaintiffs sought to add a fourth plaintiff (Richardson), add state law claims, and other factual allegations (Filing No. 106). Over Garl's opposition, the Court granted Plaintiffs leave to amend (Filing No. 131).

Plaintiffs filed their Second Amended Complaint, which is the operative pleading, on April 7, 2025 (Filing No. 132). A few weeks later, Defendants filed the instant Motions to Dismiss (Filing No. 140; Filing No. 142). The parties have since filed their oversized briefs in support and opposition, and the Motions are now ripe for the Court's consideration.

## II.     LEGAL STANDARD

### A.     Motion to Dismiss under Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633.

However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation modified). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

**B.      Motion to Dismiss Under Rule 12(b)(1)**

A motion to dismiss under Rule 12(b)(1) challenges the court's subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The burden of proof is on the plaintiff, the party asserting jurisdiction. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2003), *overruled on other grounds by Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc). "The plaintiff has the burden of supporting the jurisdictional allegations of the complaint by competent proof." *Int'l Harvester Co. v. Deere & Co.*, 623 F.2d 1207, 1210 (7th Cir. 1980). "In deciding whether the plaintiff has carried this burden, the court must look to the state of affairs as of the filing of the complaint; a justiciable controversy must have existed at that time." *Id.*

8

When ruling on a motion to dismiss for lack of subject-matter jurisdiction, "the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff." *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995) (citation omitted). Further, "the district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (citation modified).

### III.    DISCUSSION

The Second Amended Complaint brings the following claims for relief: Count I:Violation of Title IX (pre-assault, against the University); Count II: Violation of Title IX (post-assault, against the University); Count III: Violation of 42 U.S.C. § 1983 (against Garl); Count IV: Intentional Infliction of Emotional Distress (against Garl); Count V: Willful or Wanton Misconduct (against Garl); Count VI: Respondeat Superior (against the University); Count VII: Negligence (against the University). (Filing No. 132 at 27-33).

Defendants move for dismissal of Plaintiffs' claims for several reasons. The University argues that all of Plaintiffs' claims are barred by the applicable statutes of limitations, that Plaintiffs do not seek recoverable damages under Title IX, and that they failed to timely satisfy the pre-suit notice requirements of the Indiana Tort Claims Act. Garl contends that Plaintiffs fail to adequately plead the elements of their Section 1983 claims, that he is entitled to qualified and statutory immunity, that the state law claims are barred by the Indiana Medical Malpractice Act, and—like the University argues—that Plaintiffs' claims are barred by the statute of limitations. The Court begins with the statute of limitations issue, as it is dispositive of Plaintiffs' federal claims.

### A.    Statute of Limitations for Plaintiffs' Federal Claims

A statute of limitations defense "is not normally part of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)," but "when the allegations of the complaint reveal that relief is

9

barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011); *see Brooks v. Ross*, 578 F.3d 574, 579 (7th Cir. 2009) ("While complaints typically do not address affirmative defenses, the statute of limitations may be raised in a motion to dismiss if the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." (citation modified)).

The parties do not dispute that Plaintiffs' Title IX and Section 1983 claims are subject to a two-year statute of limitations, so the Court applies that statutory period for purposes of the instant Motions. (Filing No. 143 at 19; Filing No. 159 at 7; Filing No. 141 at 56–57); *see Doe v. Howe Military Sch.*, 227 F.3d 981, 988–89 (7th Cir. 2000) (applying two-year statute of limitations to Section 1983 claim and declining to address district court's application of same limitations period to Title IX claim); *Lee v. New Castle Cmty. Sch. Corp.*, No. 15-cv-1498, 2017 WL 283482, at *3 (S.D. Ind. Jan. 23, 2017) (applying Indiana's two-year statute of limitations for personal injury to plaintiff's Title IX and Section 1983 claims). However, the parties vigorously dispute when the two-year clock started ticking—*i.e.*, when Plaintiffs' claims accrued.

"While state law determines the length of the limitations period, federal law determines the date of accrual of the cause of action." *Logan*, 644 F.3d at 581–82; *see Wallace v. Kato*, 549 U.S. 384, 387–88 (2007). "[A] claim accrues when the plaintiff knows or should know that his or her constitutional rights have been violated. To determine when the claim accrues, a court must first identify the plaintiff's injury and then determine when the plaintiff could have sued for that injury." *Logan*, 644 F.3d at 581–82 (citation modified). Plaintiffs argue that their claims did not accrue until 2024 and 2025, when they realized that Bomba's conduct was sexual harassment and abuse.

Plaintiffs rely on a 2022 decision by the Sixth Circuit Court of Appeals involving tragically similar facts. In *Snyder-Hill v. Ohio State University*, an Ohio State University team doctor

allegedly abused hundreds of young male student-athletes throughout the 1970s, 1980s, and 1990s. 48 F.4th 686, 689–90 (6th Cir. 2022). The *Snyder-Hill* plaintiffs "differ[ed] as to whether they knew at the time that [the doctor had] abused them, [but] *all* allege[d] that they could not have known about Ohio State's responsibility for the abuse." *Id.* at 695 (emphasis in original). In April 2018, Ohio State announced that it had commissioned an independent investigation into allegations of sexual misconduct by the team doctor. A few months later, the plaintiffs sued under Title IX, alleging that the school was deliberately indifferent to the plaintiffs' heightened risk of abuse. The district court dismissed the claims as time barred, but a split Sixth Circuit reversed.

The Sixth Circuit first reasoned that the discovery rule applies to Title IX claims. *Id.* at 698–701. The court then held that under the discovery rule, and based on the allegations in the complaint, the *Snyder-Hill* plaintiffs' claims did not accrue until 2018 for three "separate and independent" reasons: (1) the plaintiffs plausibly alleged they did not know, and lacked reason to know, that Ohio State caused their injury; (2) they plausibly alleged that even if they had investigated, they could not have learned of Ohio State's conduct; and (3) most plaintiffs plausibly alleged that "they did not know they were abused." *Id.* at 706–07. Plaintiffs argue that this case is materially similar to *Snyder-Hill*, so this Court should adopt the Sixth Circuit's reasoning and find that Plaintiffs' claims did not accrue until 2024 at the earliest (Filing No. 159 at 13). Plaintiffs argue that before 2024, they did not know or have reason to know that Defendants caused their injury, and they did not know they were abused.

Defendants contend that *Snyder-Hill* is not binding, runs contrary to United States Supreme Court and Seventh Circuit precedent, and "effectively nullifies" the statute of limitations for Title IX claims, citing the dissent in *Snyder-Hill* (Filing No. 143 at 24–26; Filing No. 163 at 5).

11

Defendants argue that Plaintiffs' own allegations show that they had a "complete and present cause of action" while they were students (Filing No. 143 at 23 (quoting *Wallace*, 549 U.S. at 388)).

The Seventh Circuit has not yet had an opportunity to decide whether the discovery rule applies to Title IX claims, although the court did apply the discovery rule in a recent Section 1983 case arising out of student sexual abuse. In *Cielak v. Nicolet Union High School District*, 112 F.4th 473, the two plaintiffs alleged they were abused by a teacher, Johnson, in the 1980s under the guise of a physiological study. One plaintiff, Hodges, reported the abuse to another teacher. A school board member confronted Johnson, but Johnson was not terminated. Although Johnson left Hodges alone after that, Hodges continued to be traumatized by Johnson's presence at the school. The other plaintiff, Cielak, told his physical education teacher about the abuse, but no action was taken, and Cielak continued to be abused by Johnson. *Id.* at 475–76. In 2016, a former student reported Johnson's abuse to the school, and as a result, the school opened an independent investigation. The school district released the investigation's findings to alumni, and the *Cielak* lawsuit followed. The district court dismissed the plaintiffs' Section 1983 claims and relinquished supplemental jurisdiction over the remaining claims, and the plaintiffs appealed.

The Seventh Circuit affirmed the dismissal as to Hodges but reversed as to Cielak. The Seventh Circuit agreed that Hodges' claims were time barred because "Hodges knew in the fall of 1983 that he experienced psychological distress because Johnson remained at [the school]," and "Hodges also knew that Johnson was still employed . . . despite Hodges notifying a teacher of the abuse and thus knew (or at least had reason to know) that defendants' failure to fire or otherwise remove Johnson . . . caused his injury." *Id.* at 478. The Seventh Circuit did not adopt or rely on

12

*Snyder-Hill*, except to cite[1] it for the proposition that "in the analogous context of Title IX, . . . '[a] plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to the time of the school's inadequate response." In dicta, the Seventh Circuit considered that the fact that "Johnson remained after Hodges reported the abuse to a teacher *might not* be enough on its own for [the court] to conclude that Hodges knew or had reason to know his injury was caused by defendants' actions." *Id.* (emphasis added). But the court declined to decide whether that fact, alone, was sufficient to establish Hodges' knowledge of the cause of his injuries because other undisputed facts did. *Id.* Hodges allegations "unambiguously show[ed] he knew both the fact (Johnson's presence) and cause of his injury (defendants' decision to continue Johnson's employment)," so Hodges "had a complete cause of action . . . in the fall of 1983." *Id.*

Cielak's claims, though, were saved from dismissal by the discovery rule. Cielak's allegations, unlike Hodges', did not "clearly show" that he knew or had reason to know that his injury "had any connection to actions by [the school], the school district, or the school board members." *Id.* Cielak's single allegation that he told a physical education teacher about the abuse was "far from unequivocally showing Cielak knew or had reason to know that defendants were aware of Johnson's conduct . . . and failed to act." *Id.* at 479. The Seventh Circuit therefore found it was improper to hold Cielak's claim to be time barred. *Id.*

Two courts in this circuit have also recently applied the discovery rule to Title IX cases. In *Greene v. Woodlawn Unit School District #209*, No. 22-cv-2727, 2023 WL 6216943 (S.D. Ill. Sept. 25, 2023), Greene alleged that between 1995 and 2004, she was repeatedly abused by a teacher. In

---

[1] The Seventh Circuit cited *Snyder-Hill* with the citation introductory signal "Cf.," which indicates that the "[c]ited authority supports a proposition different from the main proposition but sufficiently analogous to lend support. Literally, 'cf.' means 'compare.' The citation's relevance will usually be clear to the reader only if it is explained." The Bluebook: A Uniform System of Citation R. 1.2(a) (Columbia L. Rev. Ass'n et al. eds., 22d ed. 2025). Based on this citation signal and explanatory parenthetical, the Court disagrees with Plaintiffs that the Seventh Circuit "embraced *Snyder Hill*'s reasoning" in *Cielak* (Filing No. 159 at 16).

2014, she began having "flashbacks and memories of sexual abuse" and "began to realize that she had been the victim of sexual abuse and that her sexual relationship with [the teacher], and others, was inappropriate and a violation of the law." *Id.* at *1–2 (internal citation omitted). Greene filed a Title IX action in November 2022 arguing, in part, that her claims "accrued in 2014 (when [she] began having flashbacks and memories of the sexual abuse)." *Id.* The court applied Illinois' two-year statute of limitations for personal injury claims, and in deciding when Greene's claims accrued, the court found that the discovery rule should apply. *Id.* at *6. The *Greene* court also found *Snyder-Hill* persuasive. *Id.* ¶ *9. Importantly, though, the *Greene* court focused on *Snyder-Hill*'s holding that a Title IX claim does not accrue until the Plaintiff knows or has reason to know that school employees with authority to take corrective action failed to respond to the misconduct. *Id.* at *8–9. The court ultimately held that Greene's claims should not be dismissed because her complaint did not allege when she discovered that the school failed to respond to the teacher's misconduct. However, the court did not address Greene's argument that her claims did not accrue until she realized that her sexual relationship with the teacher had been abusive, nor did the court mention *Snyder-Hill*'s holding on that issue.

In *Kane v. University of Chicago*, No. 22 CV 6476, 2024 WL 1157396 (N.D. Ill. Mar. 18, 2024), the plaintiffs (former and current female college students) alleged that they were sexually assaulted by male students and/or individuals affiliated with the university, and that the university was deliberately indifferent to the harassment. *Id.* at *1. The Northern District of Illinois held that the plaintiffs' Title IX claims were viable, that they were subject to Illinois' two-year statutes of limitations for personal injury claims, and—citing *Snyder-Hill*—that Title IX claims based on a school's deliberate indifference accrue when the plaintiff knows, or has reason to know, of the school's inaction. *Id.* at *7. The *Kane* court, like the *Greene* court, declined to dismiss plaintiffs'

Title IX claims at the pleadings stage because the complaint did not allege when plaintiffs learned about the university's inaction. *Id.* The court did not adopt any other holdings from *Snyder-Hill*.

With this background in mind, the Court addresses the parties' statute of limitations arguments. Based on well-settled Seventh Circuit precedent, the "discovery rule" applies to Plaintiffs' Section 1983 claim against Garl, and application of the discovery rule to Title IX claims appears to fall in line Seventh Circuit precedent applying the rule to Section 1983—including *Cielak*—for the reasons explained in *Greene*, 2024 WL 6216943, at *9. *See also McCool v. Strata Oil Co.*, 972 F.2d 1452, 1456 (7th Cir. 1992) ("Use of a discovery principle is uncontroversial."); *Devbrow v. Kalu*, 705 F.3d 765, 769 (7th Cir. 2013) (reversing dismissal of Section 1983 deliberate-indifference claim arising from delayed cancer treatment based on application of discovery rule); *Doe v. Bd. of Educ. of Hononegah Cmty. High Sch. Dist. #207*, 833 F. Supp. 1366, 1376 (N.D. Ill. 1993) ("While she may have known she was abused, there is nothing in the complaint to remotely suggest that she knew or should have known of the alleged acts or omissions on the part of the defendants. . . . Accordingly, her claims did not accrue during the time periods of her sexual abuse . . . ."). However, this Court need not decide whether the discovery rule applies to Plaintiffs' claims, because even assuming it does, Plaintiffs unambiguously allege that they had knowledge of (1) the fact of and (2) the cause of their injuries decades before bringing suit.

Plaintiffs contend they have plausibly alleged that they did not learn of the fact of their injuries until 2024 when, through conversations with others, they realized that Bomba's conduct constituted sexual abuse and harassment (Filing No. 159 at 10–11). Plaintiffs also claim that no reasonable person in their position could have discovered their injury any sooner because the widespread knowledge and acceptance of Bomba's conduct led Plaintiffs to believe it was

appropriate. Defendants argue that Plaintiffs' knowledge of Bomba's conduct, not that the conduct was unlawful, is the relevant consideration (Filing No. 143 at 21–23; Filing No. 141 at 57–58).

The Court agrees with Defendants. The Court acknowledges that in *Snyder-Hill*, the Sixth Circuit expressly held that plaintiffs who experience sexually abusive conduct do not have knowledge of their injury until they "know they were abused." *Id.* at 706.[2] This Court, however, is not bound by *Snyder-Hill* and finds that adopting this specific holding would constitute a significant departure from binding Seventh Circuit and United States Supreme Court precedent.

As noted in the *Snyder-Hill* dissent, Plaintiffs' position "conflates 'injury' with what qualifies as 'sexual abuse,'" and "[i]t is 'discovery of the *injury*' alone that 'starts the clock.'" *Snyder-Hill*, 48 F.4th at 716 (Guy, J., dissenting) (emphasis in original) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). In context of medical malpractice cases, the United States Supreme Court and Seventh Circuit have repeatedly held that a plaintiff's knowledge of an injury—not that the injury is wrongful—is what matters for determining when a claim accrues. The Supreme Court stated in *United States v. Kubrick*:

> We are unconvinced that for statute of limitations purposes a plaintiff's ignorance of his legal rights and his ignorance of the fact of his injury or its cause should receive identical treatment. That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask.

---

[2] The Sixth Circuit based this holding on robust evidence that victims of abuse often do not recognize it as abuse, and one district court decision discussing the accrual of sexual battery claims under California law. *Snyder-Hill*, 48 F.4th at 706 (citing *Doe v. Pasadena Hosp. Ass'n*, No. 18-cv-8710, 2020 WL 1244357, at *6 (C.D. Cal. Mar. 16, 2020)).

444 U.S. 111, 122 (1979) (footnote omitted); *id.* at 121 n.8 (rejecting appellate cases holding that plaintiffs "must know the legal implications of the facts, as well as the facts themselves, before the limitations period will begin to run"). The Seventh Circuit has likewise explained:

> The statute of limitations does not await the plaintiff's knowledge that his injury was caused by negligence or reckless conduct. Once armed with knowledge that he has been injured and by whom, the potential . . . plaintiff has reason to believe that he may have a legal claim; and he then has the statutory period in which to conduct the necessary investigation and prepare and file a suit.

*Massey v. United States*, 312 F.3d 272, 276 (7th Cir. 2002) (citation modified); *see McCool*, 972 F.2d at 1465 ("[A]s to accrual, we, like the Supreme Court, have maintained that there is an important distinction between discovery of an *injury* and discovery of a *cause of action*." (emphases in original)); *Arroyo v. United States*, 656 F.3d 663, 672–73 (7th Cir. 2011) (affirming post-trial order dismissing Federal Tort Claims Act claims are untimely; "[A]ccrual does not wait until the plaintiff learns that their injury was caused by a doctor's negligence." (footnote and citations omitted) (citing *Kubrick*, 444 U.S. at 123; *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985))); *Koch v. CGM Grp., Inc.*, No. 00-216-C, 2001 WL 392523, at *5 (S.D. Ind. Apr. 3, 2001) (McKinney, J.) (granting motion to dismiss; "The discovery rule does not require that a plaintiff . . . know for certain that her legal rights have been violated. Otherwise, no one would ever 'discover' that they had been discriminated against until after a formal trial has been completed." (citation omitted)).

Likewise, in many Section 1983 cases, the plaintiff does not at first realize that the complained-of conduct was unconstitutional, yet the Seventh Circuit and its courts have held that the plaintiff's knowledge of the conduct, not their knowledge of the conduct's unlawfulness, is what triggers the limitations period. *See Tobey v. Chibucos*, 890 F.3d 634, 646–47 (7th Cir. 2018) (affirming dismissal of Section 1983 claims based on alleged "kidnapping" and detention in Florida jail as time barred; finding that claims accrued at time of kidnapping, not when a lawyer

17

later reviewed the plaintiff's file and suggested that transportation and detention may have been unlawful); *Moore v. Burge*, 771 F.3d 444, 447–48 (7th Cir. 2014) (affirming dismissal of Section 1983 claims arising from officer's use of torture to extract statements from detainees; "All five plaintiffs knew from the day they were subjected to torture that they had been injured, and by whom. Failure to appreciate that an act is wrongful does not defer the claim's accrual (that's the holding of *Kubrick*)."); *Payne v. Campbell*, No. 19-cv-2859, 2020 WL 5413756, at *3 (S.D. Ind. Jan. 14, 2020) (recommending that district court grant motion to dismiss as time barred a Section 1983 claim that accrued when plaintiff received information indicating that police officer's crash report contained false information, not when plaintiff later learned that police department was refusing to fix the issue), *report and recommendation adopted*, No. 19-cv-2859, 2020 WL 2512025 (S.D. Ind. May 15, 2020); *Mihelic v. Will Cnty.*, 826 F. Supp. 2d 1104, 1112–13 (N.D. Ill. 2011) (granting motion to dismiss Section 1983 claim, which accrued at the time police searched plaintiff's home, not when she later "met with an attorney who informed her that her constitutional rights had been violated"; "There is . . . no support for Plaintiff's claim that her ignorance of the law should serve as a basis for applying the discovery rule.").

In a recent case before this Court, the plaintiff sued the National Collegiate Athletic Association ("NCAA") under Section 1981 and Section 1985, alleging that the NCAA's academic performance program discriminated against Historically Black Colleges and Universities by disparately subjecting those institutions and their players to penalties, including bans on postseason play. *Manassa v. Nat'l Collegiate Athletic Ass'n*, No. 20-cv-3172, 2023 WL 10367398 (S.D. Ind. Oct. 19, 2023). On summary judgment, the NCAA argued that the plaintiff's claims accrued in April 2016, when the plaintiff learned that his team would be unable to play in the 2016–17 postseason, but the plaintiff argued that his claims did not accrue until October 2020, when he

18

"first became aware that the NCAA discriminated against him on the basis of race via the [academic performance program]." *Id.* at *4. The Court was persuaded by the NCAA, explaining that Section 1981 claims "accrue when the act of which the plaintiff complains occurs, not when the plaintiff learns or suspects that the act was allegedly discriminatory, or when the effects of the alleged discrimination are felt." *Id.* at *5. The plaintiff brought his claims more than four years (the applicable statutory period) after his team was banned from postseason play, so the Court dismissed his claims as time barred.

The Court is also persuaded by analogous employment discrimination cases, like *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446 (7th Cir. 1990). The plaintiff in that age discrimination case, Cada, was told on May 5 by his supervisor that he (Cada) would be fired soon after his replacement was hired. At the time, Cada did not believe that his supervisor had the authority to fire him. On May 22, Cada spoke with a manager who confirmed that the decision to terminate him had already been made. On July 7, Cada's replacement—a young woman—was hired, and Cada was fired three weeks later. It was not until Cada saw his replacement that he "realize[d] he was a victim of age discrimination." *Id.* at 449. The next March, Cada filed a charge with the Equal Employment Opportunity Commission ("EEOC"). The charge was filed more than 300 days after Cada's May 5 meeting with this supervisor but less than 300 days after his May 22 meeting with the manager and July 7 revelation about his replacement. The employer argued that Cada's claims accrued on May 5, but Cada argued that his claims did not accrue until May 22 or July 7. On summary judgment, the district court dismissed Cada's claims as time barred, and Cada appealed.

The Seventh Circuit ultimately held that the discovery rule did not apply to Cada's claims because the undisputed evidence showed that Cada knew that he had been fired as of May 5. *Id.* at 450. But in dicta, the court posited that if Cada had not known about his termination on May 5,

19

then his claims would have accrued on May 22. The fact that Cada did not realize that his termination was wrongful sooner than July 7 did not affect his claims' accrual. *Id.* at 450–51. Rather, it might have been a basis for invoking the doctrine of equitable tolling, which applies where the plaintiff knows he has been injured "but he cannot obtain information necessary to decide whether the injury is due to wrongdoing and, if so, wrongdoing by the defendant." *Id.* at 451 (noting that the discovery rule and equitable tolling are "frequently confused"); *id.* at 452 (stating that Cada's claims might have survived "[i]f the discovery rule extended the statute of limitations to May 22" or "if the statute of limitations was *tolled* between May 5 and July 7 (when he discovered that he had been replaced by a younger person)" (emphasis added)). The Seventh Circuit therefore affirmed the dismissal of Cada's claims as time barred.

The Seventh Circuit reached the same conclusion for the same reason in *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995). In that case, plaintiff Thelen was terminated from his job. For almost a year, Thelen believed that another employee (only six years younger than him) had taken over his duties. However, Thelen eventually learned that a different employee (thirty-three years younger than him) had filled the role. *Id.* at 267. Thelen filed his EEOC Charge within 300 days of learning about his actual replacement, but more than 300 days after his termination. He argued that his claims did not accrue until he learned who his replacement was, since that was when he first "suspected that he may have been a victim of age discrimination." *Id.* The Seventh Circuit disagreed. "Thelen has confused the discovery rule with the doctrines of equitable tolling and estoppel. A plaintiff's action accrues when he discovers that he has been injured, not when he determines that the injury was unlawful." *Id.* The injury was Thelen's termination, and he "provided no plausible justification" for waiting more than 300 days to file his EEOC charge, so his claims were time barred. *Id.* at 269; *see also Dykman v. Bd. of Regents of*

20

*Univ. of Wis. Sys.*, No. 23-3429, 2024 WL 3825221, at *2 (7th Cir. Aug. 15, 2024) (affirming dismissal of disability discrimination claim as time barred; finding that claim when plaintiff "learned of his injury—his revoked [teaching] appointment—not when he learned that the injury resulted from alleged discrimination.").

The above wealth of authority shows why this Court cannot accept Plaintiffs' position that they did not know of their injuries until they realized that Bomba's conduct was sexual abuse and sexual harassment. That Plaintiffs did not sooner realize that Bomba's conduct was unlawful and actionable does not affect the date their claims accrued. The Court therefore finds that the Plaintiffs knew of the fact of their injury around the time they were assaulted.

The Court now turns to the issue of when Plaintiffs knew that Defendants caused their injury. Plaintiffs allege they "did not know, or have reason to know, until 2024 that officials of [the University] with authority to take corrective action knew of Dr. Bomba, Sr.'s misconduct and failed to respond appropriately, and therefore that [the University's] deliberate indifference to Dr. Bomba, Sr.'s misconduct caused injury to Plaintiffs and the Class." (Filing No. 1 ¶¶ 99, 132). This conclusory allegation, though, is belied by other factual allegations in the Second Amended Complaint.

To start, Plaintiffs allege that Bomba's sexual assaults were widely known among University staff, including "assistant coaches, athletic trainers, and other Hoosier men's basketball staff." *Id.* ¶¶ 100, 121 (alleging an athletic trainer had authority to take corrective action). Indeed, Plaintiffs allege that they believed Bomba's conduct was appropriate *because* they knew the University continued to contract with him despite knowing what he was doing. *Id.* ¶¶ 102–06.

Even under *Snyder-Hill*'s incredibly forgiving standard—where "[k]nowledge that coaches or trainers knew is not enough" and "the clock starts only once the plaintiff knows or should have

21

known that . . . administrators with authority to take corrective action knew of [the] conduct and failed to respond appropriately"—Plaintiffs plainly knew of the cause of their injury long before 2024. *Snyder-Hill*, 48 F.4th at 705. Specifically, the Second Amended Complaint identifies Garl as a University official "with authority to take corrective action" to end Bomba's conduct (Filing No. 132 ¶¶ 118–19). Plaintiffs clearly state that they knew that Garl knew what Bomba was doing; Garl allegedly taunted Plaintiffs and their teammates about Bomba's examinations. *Id.* ¶¶ 86, 98. Garl is alleged to have "hazed them and ridiculed them for having endured Dr. Bomba, Sr.'s repeated and systematic sexual assaults." *Id.* ¶¶ 166, 168. Plaintiffs therefore plead that they had knowledge that Defendants were the cause of their alleged injuries long before 2024.

In sum, Plaintiffs have "affirmatively plead[ed] [themselves] out of court" because their Second Amended Complaint "plainly reveal[s] that [the] action is untimely." *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014) (citation modified). Plaintiffs' allegations unambiguously show that they knew both the fact and the causes of their injuries, and they therefore had complete causes of action against the University under Title IX and against Garl under Section 1983, between 1981 and 2000.

Defendants also contend that the two-year statute of limitations is not subject to equitable tolling in this case (Filing No. 143 at 26–27; Filing No. 141 at 62–65), and Plaintiffs offer no argument in response thus waiving any opposition. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010); *Jack-Kelly v. City of Anderson*, No. 22-3299, 2023 WL 4864828, at *3 (7th Cir. July 31, 2023) (concluding that equitable tolling argument was "waived" because plaintiff "fail[ed] to raise [the argument] in response to the motion to dismiss").

The Court therefore concludes that Plaintiffs' Title IX and Section 1983 claims are barred by the applicable two-year statutes of limitations and must be **dismissed**.

At the conclusion of their response briefs, Plaintiffs request that any dismissal of its claims be without prejudice (Filing No. 156 at 46; Filing No. 159 at 27). When a complaint fails to state a claim for relief, a plaintiff is ordinarily given a chance to amend the complaint to correct the problem. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013). However, leave to amend need not be granted if amendment would be futile. *Garcia v. City of Chi.*, 24 F.3d 966, 970 (7th Cir. 1994). Once a plaintiff has had one or more opportunities to cure the defects but fails, the court may dismiss claims with prejudice. *See Agnew v. NCAA*, 683 F.3d 328, 347 (7th Cir. 2012) (stating leave to amend need not be granted when a party has had multiple opportunities to amend and has failed to cure a defective claim); *Spears v. SLT Lending SPV, Inc.*, No. 21-cv-02934, 2023 WL 2600692, at *4 (S.D. Ind. Mar. 22, 2023) (dismissing second amended complaint with prejudice where plaintiff had multiple opportunities to plead viable claims and court could not envision a possibility of successful amendment); *see also Norman v. N.W. Ind. CA Section 8*, 21-cv-158, 2021 WL 4363012, at *5 (N.D. Ind. Sept. 24, 2021) (dismissing second amended complaint with prejudice when the plaintiff had been given opportunities to amend her complaint).

Plaintiffs have already had two opportunities to amend their complaint, each time with the benefit of Defendants' dispositive motions briefing. And because Plaintiffs have affirmatively pleaded their federal claims out of court on statute-of-limitations grounds, the Court does not envision a possibility of successful amendment. The Court therefore **denies** Plaintiffs' request for a further opportunity to amend and **dismisses** their federal claims **with prejudice**.

B.    **Supplemental Jurisdiction Over State Law Claims**

Because Plaintiffs' federal claims are dismissed, the Court must decide whether it is appropriate to continue to exercise supplemental jurisdiction over the remaining state law claims. The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claims. *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c)

("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction . . . ."). When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" *City of Ci. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Sharp Elecs. v. Metro. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) (citation and quotation marks omitted). Exceptions to the general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation omitted).

The Court finds that none of the exceptions applies to Plaintiffs' state law claims, and the Court sees no reason to deviate from the "usual practice" of relinquishing supplemental jurisdiction over state law claims. *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999). The parties vigorously dispute when Plaintiffs' claims accrued, and thus whether the statute of limitations expired before Plaintiffs filed this action. However, the statute of limitations certainly did not run *during* this action, as both federal and state law toll the relevant limitations period when claims are pending in a civil action (except in limited circumstances not present here). 28 U.S.C. § 1367(d); Ind. Code § 34-11-8-1; *see also Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 266

24

(7th Cir. 1998). Dismissal of Plaintiffs' state law claims without prejudice at this time will not preclude the filing of a separate suit in state court.

Additionally, the Court has not expended significant resources on the pending state-law claims. No other dispositive motions have been ruled on in this action, and to the extent the parties have conducted discovery, those efforts can be duplicated in state court with relative ease. Further, it is not absolutely clear how the pendent state law claims should be decided. The resolution of Plaintiffs' federal claims depended on *federal* standards for accrual. The question of when Plaintiffs' state law claims accrued under Indiana law, or whether they are subject to dismissal for other reasons under Indiana law, cannot be resolved with absolute certainty at this stage. They should be decided by an Indiana state court.

And lastly, as always, comity favors allowing state courts to decide issues of state law. The remaining state law claims raise complex, nuanced issues regarding statutes of limitations in a growing field of important cases. These are quintessential state law issues that are best resolved by state courts. This consideration weighs strongly in favor of remand. *See* 28 U.S.C.(s) 1367(c)(1) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the claim raises a novel or complex issue of State law . . . ."). On this point, the Seventh Circuit's decision in *Wentzka v. Gellman,* 991 F.2d 423 (7th Cir. 1993), is particularly instructive, holding that a district court *abused its discretion* by retaining jurisdiction over a case where state law was unsettled. *Id.* at 425 ("Nor have we found any other extraordinary circumstances which would lead us to believe that the retention of jurisdiction was necessary in this instance. To the contrary, we can identify one very good reason why the district should not have reached the merits of plaintiffs' commonlaw misrepresentation claims . . . the unsettled nature of Wisconsin law in the area of justifiable reliance."). In other words, the questions at issue are not the type of "no brainers" that

25

would compel the Court to retain jurisdiction. *See Martin v. Ind. State Police,* 537 F. Supp. 2d 974, 989 (S.D. Ind. 2008) (stating that unless remaining state law claims are "no brainers," the "court's duty of comity toward Indiana courts in developing Indiana law directs the court to remand all state law claims to the state courts").

In sum, the application of the *Carnegie-Mellon* factors, coupled with the presumption of relinquishment, leads to the conclusion that Plaintiffs' state law claims should be dismissed so that they may be refiled in state court and resolved by an Indiana state court. The Court therefore relinquishes supplemental jurisdiction over Plaintiffs' state law claims, which are **dismissed without prejudice** for lack of subject-matter jurisdiction.

### IV.   CONCLUSION

A motion to dismiss pursuant to Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). For the reasons discussed in this Order, Defendants' Motions to Dismiss (Filing No. 140; Filing No. 142) are **GRANTED**. Plaintiffs' federal claims under Title IX (Counts I and II) and Section 1983 (Count III) are **DISMISSED with prejudice**. The Court **relinquishes supplemental jurisdiction** over Plaintiffs' remaining state law claims (Counts IV–VII), and those claims are **DISMISSED without prejudice**. All other pending motions (Filing No. 200; Filing No. 203; Filing No. 206; and Filing No. 207, Filing No. 210), are **DENIED AS MOOT**.

Final judgment will issue under separate entry.

**SO ORDERED**.

Date:   3/31/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

William J. Beggs
BUNGER & ROBERTSON
wjbeggs@lawbr.com

Annavieve C. Conklin
DELANEY & DELANEY LLC
ACONKLIN@DELANEYLAW.NET

Andrea M. Dalimonte
Miller Johnson
dalimontea@millerjohnson.com

Kathleen Ann DeLaney
DELANEY & DELANEY LLC
kathleen@delaneylaw.net

Andrew David Dettmer
Dinsmore & Shohl LLP - Indianapolis
andrew.dettmer@dinsmore.com

David G. Field
SCHULTZ & POGUE LLP
dfield@schultzpoguelaw.com

Amanda Jane Gallagher
Barnes & Thornburg LLP
Amanda.Gallagher@btlaw.com

Matthew R. Gutwein
DELANEY & DELANEY LLC
mgutwein@delaneylaw.net

Daniel R. Kelley
DINSMORE & SHOHL LLP (Indianapolis)
daniel.kelley@dinsmore.com

Christopher D. Lee
Dinsmore & Shohl
Christopher.Lee@Dinsmore.com

John R. Maley
BARNES & THORNBURG, LLP (Indianapolis)
jmaley@btlaw.com

Amy Elizabeth Murphy
Miller Johnson
murphya@millerjohnson.com

Alexander James Pantos
DeLaney & DeLaney
apantos@delaneylaw.net

Jon M. Pinnick
Schultz & Pogue LLC
jpinnick@schultzpoguelaw.com

Dylan Pittman
BARNES & THORNBURG, LLP (Indianapolis)
dylan.pittman@btlaw.com

Charity Seaborn
Barnes & Thornburg LLP
Charity.Seaborn@btlaw.com

James H. Voyles
VOYLES VAIANA LUKEMEYER BALDWIN & WEBB
jvoyles@voyleslegal.com